John P. McPADDEN, Sr., Plaintiff,

v.

Sanjiv S. SIDHU, Stephen Bradley, Harvey B. Cash, Richard L. Clemmer, Michael E. McGrath, Lloyd G. Waterhouse, Jackson L. Wilson, Jr., Robert L. Crandall and Anthony Dubreville, Defendants,

and

i2 Technologies, Inc., Nominal Defendant.

Civil Action No. 3310–CC.

Court of Chancery of Delaware.

Submitted: June 17, 2008.

Decided: Aug. 29, 2008.

Norman M. Monhait, of Rosenthal Monhait & Goddess, P.A., Wilmington, Delaware; of Counsel: Robert C. Schubert, Juden Justice Reed, and Aaron H. Darsky, of Schubert & Reed L.L.P., San Francisco, California, Attorneys for Plaintiff.

Kenneth J. Nachbar and Leslie A. Polizoti, of Morris, Nichols, Arsht & Tunnell L.L.P., Wilmington, Delaware; of Counsel: Jordan D. Hershman, Michael D. Blanchard, and Matthew C. Applebaum, of Bingham McCutchen L.L.P., Boston, Massachusetts, Attorneys for Defendants.

## *OPINION*

CHANDLER, Chancellor.

Though what must be shown for bad faith conduct has not yet been completely defined,[1] it is quite clearly established that gross negligence, alone, cannot constitute bad faith.[2] Thus, a board of directors may act "badly" without acting in bad faith. This sometimes fine distinction between a breach of care (through gross negligence) and a breach of loyalty (through bad faith) is one illustrated by the actions of the board in this case.

## I. BACKGROUND

In June 2005, the board of directors of i2 Technologies, Inc. ("i2" or the "Company") approved the sale of i2's wholly owned subsidiary, Trade Services Corporation ("TSC"), to a management team led by then-TSC vice president, defendant Anthony Dubreville ("Dubreville") for $3 million. Two years later, after first rejecting an offer of $18.5 million as too low just six months after the sale, Dubreville sold TSC to another company for over $25 million. These transactions engendered this lawsuit and the motions to dismiss presently before me. Plaintiff alleges that the Company's directors caused the Company to sell TSC to Dubreville's team for a price that

---

**1.** *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66 (Del.2006) (identifying the three most salient examples of bad faith conduct, but explicitly noting that there "may be other examples of bad faith yet to be proven or alleged") (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755–56 (Del. Ch.2005)). *See also id.* at 64 (noting that the "duty to act in good faith is, up to this point relatively uncharted"); *Stone ex rel. AmSouth*

*Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006).

**2.** *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 64, 65. (" '[W]e address the issue of whether gross negligence (including a failure to inform one's self of available material facts), without more, can constitute bad faith.' The answer is clearly no.").

the directors knew to be a mere fraction of TSC's fair market value.

### A. Procedural History

Plaintiff utilized a section 220 books and records demand to investigate the TSC sale. He later initiated this action on behalf of i2 to recover the losses it sustained as a result of the alleged bad faith conduct of the board and Dubreville. Plaintiff alleges that demand is excused for futility because the board's approval of the sale was not a proper exercise of business judgment. In his complaint, plaintiff alleges two causes of action. First, he asserts a breach of fiduciary duty claim against the directors who approved the sale of TSC and against Dubreville. Second, plaintiff alleges unjust enrichment against Dubreville alone. All defendants, including nominal defendant i2, together move to dismiss plaintiff's complaint pursuant to Chancery Rule 12(b)(6) for failure to state a claim and Chancery Rule 23.1 for failure to plead particularized facts excusing plaintiff's failure to make a demand upon the board.

### B. The Parties

Nominal defendant i2, a Delaware corporation headquartered in Dallas, Texas, sells supply chain management software and related consulting services. i2's charter includes an exculpatory provision, which protects i2's directors from liability to the fullest extent under Delaware law. The Company operated a division known as the Content and Data Services Division ("CDSD"), which included both TSC and another subdivision known as CDS. TSC occupied a niche market unrelated to i2's main line of business.

Defendants Sanjiv S. Sidhu ("Sidhu"), Stephen Bradley ("Bradley"), Harvey B. Cash ("Cash"), Richard L. Clemmer ("Clemmer"), Michael E. McGrath ("McGrath"), Lloyd G. Waterhouse ("Waterhouse"), Jackson L. Wilson, Jr. ("Wilson"), and Robert L. Crandall ("Crandall" and, together, the "Director Defendants") were or still are members of the i2 board of directors. All Director Defendants approved the 2005 sale of TSC. Of these directors, defendants Cash, Crandall, Clemmer, Bradley, Waterhouse, and Wilson were members of the board's special committee that was charged with reviewing the Sonenshine fairness opinion. Defendant Dubreville was not a director of i2; he was vice president of CDCS, which, as described above, was a division of i2 that included TSC.

## II. FACTS[3]

The gravamen of plaintiff's complaint is that i2's directors caused the Company to sell TSC, its wholly owned subsidiary, to members of TSC's management in bad faith for a price that defendants knew was a fraction of TSC's fair market value.

### A. i2's Purchase of TSC

In early 2001, i2 acquired TSC and a related company for $100 million. By that time, Dubreville was CEO and president of TSC. After i2's acquisition of TSC, Dubreville remained in charge of TSC. By late 2004 or early 2005, i2 decided to sell TSC after determining that TSC was a non-core business that should be divested.

### B. VIS/ME Offers to Buy TSC

In June 2002, Dubreville caused TSC to sue VisionInfoSoft and its sister company, Material Express.com, (together, "VIS/ME"), competitors of TSC, for copyright infringement. In 2002 and 2003, while the copyright litigation was pending, VIS/ME inquired about purchasing TSC, apparent-

---

**3.** The facts are as alleged in plaintiff's complaint.

ly for the purpose of resolving the lawsuit. On July 12, 2002, VIS/ME's chairman, Earl Beutler ("Beutler"), sent certified letters to i2 directors, including Sidhu, Cash, and Crandall, informing them that VIS/ME had made several inquiries regarding its interest in acquiring TSC, communicating VIS/ME's strong interest so the board would be aware of it before approving a sale to another party, and suggesting that VIS/ME was prepared to outbid other offerors. On July 27, 2002, i2's vice president, Mike Short ("Short"), telephoned Beutler in response to this letter.

On July 27, 2002, in response to Short's call, Beutler wrote Short a letter stating that he decided to again inquire about the possibility of purchasing TSC and that he also had contacted i2's CFO, but had received no response. Beutler also stated that:

> "We have heard rumors that i2 was considering a sale of [TSC] (in fact, we have learned that Anthony Dubreville announced to [TSC] employees that he was planning to purchase the company; he then filed what we believe to be a meritless lawsuit against our companies so that he could use the i2 resources to weaken a competitor and then purchase a stronger company)." [4]

This is why, Beutler wrote, he was contacting the i2 board. If such a sale was being discussed, he thought that VIS/ME would gain the most value from an acquisition of TSC because of overlap between TSC and VIS/ME customers and products. On July 30, 2002, Short e-mailed Beutler that Short would respond soon. On September 16, 2002, Beutler e-mailed Short and stated that he remained interested in TSC, if and when i2 wanted to sell it. On September 17, 2002, Short e-mailed Beut-

ler stating that i2 was not interested in selling TSC at that time. In that message, Short informed Beutler that Short was leaving i2 and that any further inquiries should be directed to Antonio Boccalandro.

In January 2003, Beutler sent a letter to Sidhu and i2's CFO stating that VIS/ME would be willing to pay up to $25 million for TSC. The letter repeated that there was significant organizational overlap between TSC and VIS/ME, and that Beutler believed the combined operations would produce significant additional cash flow within a short period of time. The i2 board discussed TSC—its business and its effect on i2—at a meeting held a few days later. Director defendants Sidhu, Cash, and Crandall attended the meeting. Later, in June 2004, TSC and VIS/ME settled their copyright infringement dispute with VIS/ME agreeing to pay quarterly licensing fees to TSC. In late 2004, Dubreville contacted VIS/ME's president and CEO to discuss Beutler's January 2003 letter.

### C. Dubreville's Continued Alleged Manipulation of TSC's Earnings

Plaintiff alleges a litany of actions purportedly taken by Dubreville (and allegedly permitted by the Director Defendants) to drive down the earnings of TSC, including incurring unnecessary expenses (such as leasing twice the necessary office space); artificially depressing TSC's EBITDA through use of a printing company that Dubreville partially owned (and thereby reaping windfall profits); and causing TSC to incur significant legal expenses in its copyright dispute with VIS/ME though the new owners of TSC (once it was sold in June 2005) were permitted to retain the benefits of the settlement.

4. Compl. ¶ 30.

### D. i2's Assessment of TSC for Fiscal Year 2005

In November 2004, i2 conducted a review of CDSD. Dubreville headed CDSD, which included TSC and the other subdivision, CDS. Under Dubreville's direction, CDSD prepared a presentation that included projections of TSC's FY 2005 revenue at $16 million, which was an increase of 2% over FY 2004, and FY 2006 revenue of $16.8 million. This presentation also stated that operational costs reflected in TSC's accounting records included costs attributable to the other business unit in CDSD (*i.e.*, CDS), and recommended a restructuring of the internal reporting system to more accurately track business unit performance.

Plaintiff alleges that these inaccurate allocations enabled Dubreville to make TSC's earnings appear lower than they actually were and that, though not disruptive to day to day operations, such improper cost allocations negatively impacted TSC's value when it was sold.

### E. The Board's Reliance on Dubreville to Broker the Sale of TSC

In December 2004, the i2 board decided to sell TSC. An offering memorandum was prepared in January 2005 to convey information about TSC to prospective purchasers. At a board meeting on February 1, 2005, i2's investment banker, Sonenshine Partners ("Sonenshine"), gave a presentation that included various options for the sale of TSC. One of these options was to sell TSC for $4.2 million to TSC employees. At this meeting, the board was also apprised of the plan to let Dubreville conduct the sale process of TSC. By this time, Dubreville was aware that VIS/ME earlier had expressed interest in buying TSC for up to $25 million and Dubreville had already discussed with i2 the possibility of leading a management buyout of TSC. Sidhu, Clemmer, Cash, Crandall, and McGrath discussed the idea of a management buyout at the February 1, 2005 board meeting. Nevertheless, no business broker or investment banker was hired; the board charged Dubreville with finding a buyer for TSC.

In mid-February, the February 2005 version of the offering memorandum was created. This version altered the projections used in the January 2005 offering memorandum; these revised projections were significantly reduced.[5] The February 2005 offering memorandum was ultimately used by Dubreville to solicit bids for TSC.

Plaintiff recounts Dubreville's limited efforts to market TSC. Dubreville did not solicit interest from any of TSC's direct competitors, which were its most likely buyers. In particular, Dubreville did not solicit interest from VIS/ME though he and at least three directors (Sidhu, Cash, and Crandall) knew VIS/ME had indicated a strong interest in buying TSC and had offered as much as $25 million for TSC in 2003. Though Dubreville did contact Reed Elsevier Inc. (owner of LexisNexis information services), he did not contact that company's largest competitor, Thomson Corporation (owner of Westlaw), because

---

**5.** The January 2005 offering memorandum projected: FY 2005 revenues of $16 million, EBITDA of $1.2 million, and free cash flow of $0.9 million; FY 2006 revenues of $17 million, EBITDA of $1.7 million, and free cash flow of $1.4 million; and FY 2007 revenues of $18 million, EBITDA of $2.2 million, and free cash flow of $1.9 million. The February 2005 offering memorandum reduced these projections to: FY 2005 revenues of $14.7 million, EBITDA of $0.6 million, and free cash flow of $0.2 million; FY 2006 revenues of $15.5 million, EBITDA of $0.75 million, and free cash flow of $0.35 million; and FY 2007 revenues of $16 million, EBITDA of $0.9 million, and free cash flow of $0.6 million.

plaintiff alleges that Dubreville knew that contacting Thomson would alert VIS/ME that TSC was for sale.

While the search for a buyer for TSC was ongoing, on March 9, 2005, the board again discussed Dubreville's proposal to lead a management buyout of TSC. By this point, Dubreville had solicited only two bids for TSC. The process Dubreville employed ultimately produced three offers for TSC. First, an electronic parts distributor, HIS, offered $12 million for the entire CDSD division, of which $4.3 million was allocated to TSC. Because i2 did not want to bundle these two businesses for sale, it rejected IHS's offer. Ultimately, in 2006 IHS purchased CDS (the other CDSD subdivision) for approximately $29 million. A second offer was from an entity named Sunrise Ventures, the principal of which was Dubreville's former boss at TSC and his partner in a printing company. Sunrise Ventures offered $1.8 million for TSC, which plaintiff alleges was a "lowball" offer designed to make the Dubreville-led group's offer of $3 million appear generous. The third offer was from the Dubreville-led group, Trade Service Holdings, LLC ("TSH"), of which Dubreville was a principal owner. On March 18, 2005, TSH offered to buy TSC for $2 million in cash and $1 million in software licensing agreements, with TSH keeping all outstanding receivables and repayments. The offer also contemplated that TSC would sublease half its existing office space, that i2 would pay for TSC's relocation within its building, and that i2 would bear the costs of the office space that TSC would not use.

### F. The Sonenshine Document and Fairness Opinion

About four days before the board's April 18, 2005 meeting to discuss the offers for TSC, Sonenshine distributed a document (the "Sonenshine Document") that includ-

ed two sets of TSC projections: the projections from the original January 2005 offering memorandum; and the revised February 2005 projections, which were significantly less profitable. Plaintiff alleges that the board knew that these projections were "inherently unreliable" because they were "buyer" projections; both sets of projections were created by TSC management under Dubreville's direction when the possibility of a management acquisition of TSC had already been contemplated. In addition, the Sonenshine Document, reporting the results of the "internally-led sale process," notes that, of the thirteen potential buyers that were contacted, most were large corporations that would be uninterested in acquiring TSC's niche business. Notably, no TSC competitors were contacted during the sale process.

On April 18, 2005, the board met to discuss the proposed management buyout of TSC and the other two offers for TSC that had been received. As detailed in the Sonenshine Document, Sonenshine confirmed to the board that its preliminary valuation of TSC was around $3 to $7 million using the February management projections; and $6 to $10.8 million using the January projections. The board then authorized management to move forward with discussions to sell TSC to TSH (the company partially owned by Dubreville), even though the board knew that Dubreville had been responsible for conducting the sale of TSC and that TSC had not been offered to competitors. In addition, plaintiff contends that neither the board nor the special committee negotiated with Dubreville before the letter of intent was signed on April 22, 2005.

Plaintiff states that the TSH offer was at the lowest end of Sonenshine's range using even the February projections and was half as much as the minimum estimated value of TSC using the January projec-

tions. In addition, plaintiff alleges gross irregularities in the approval of the sale, including that the special committee of the board (which was charged with reviewing the fairness of the transaction) never met with Sonenshine until June 21, 2005, which was a week before the sale was finally approved. At this point, under the terms of the agreement, if the special committee or i2 had decided not to go forward with the transaction, the breakup fee would have been $716,000.

Sonenshine made a preliminary presentation to the special committee on June 21, 2005, and then an advisory presentation to the special committee and the board on June 23, 2005. On June 28, 2005, the special committee and the board met and approved the transaction. Plaintiff alleges that the fairness opinion that the board relied upon was "on its face grossly and blatantly unreliable"[6] for a litany of reasons. Specifically, the two sets of financial projections used in the discounted cash flow valuation analysis were both lower than the January projections: the "seller" projections, which had never been presented to the board and which were more pessimistic than the buyer projections, and the "re-forecasted buyer" projections, which were similar to the February projections. The source of this set of projections was, as with the earlier projections, TSC's management who were, here, the buyers. In addition, plaintiff contends that the fairness opinion was flawed because it made use of unreliable, inconsistent, and unaudited financial statements, which resulted in valuations extremely favorable to the buyer and which failed to account for the improper allocation of costs between TSC and CDS. The fairness opinion also failed to include TSC's competitors on the list of "potential suitors" and omitted the fees

paid to TSC by VIS/ME as part of the litigation settlement.

In sum, the effect of these numerous alleged deficiencies is that the fairness opinion, because it was based on financial information, including projections and financial statements, provided or prepared by the buyers, favored the interests of Dubreville and TSH and produced a valuation that supported a sale at a price exceedingly favorable to the buyers. Because of the unreliability of the fairness opinion, plaintiff contends, the special committee and the board could not have relied in good faith on that opinion in its approval of the sale of TSC to Dubreville at an offer that represented 0.2X sales.

### G. The Arm's Length Sale of CDS for Approximately 2.7X Sales

Plaintiff alleges that the sale of CDS (the other subdivision in CDSD) for over $29 million (or approximately 2.7X sales) further demonstrates that the sale price for TSC was inadequate. The CDS sale occurred in early 2006.

### H. TSC's Sale for Its Allegedly True Value

In the fall of 2005, TSH offered to sell TSC to VIS/ME. In December 2005, VIS/ME offered $18.5 million. TSH, through Dubreville, rejected this offer as too low and later, in 2007, sold TSC for more than $25 million. Plaintiff contends that no significant changes to TSC's business occurred during that period of time to justify the price difference and instead attributes it to the use of accurate financial statements, which supported a higher valuation of TSC.

---

6. Compl. ¶ 60.

## III. LEGAL STANDARDS

In considering this motion to dismiss pursuant to Court of Chancery Rules 23.1 and 12(b)(6), the Court is instructed by well-established guidelines. The Court must assume the truthfulness of all well-pleaded facts in the complaint and is required to make all reasonable inferences that logically flow from the face of the complaint in favor of the plaintiff.[7] Benefiting from such reasonable inferences, the complaint will then be dismissed for failure to state a claim only if it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiff would not be entitled to the relief sought.[8] But, before I may consider that question, I must first examine whether plaintiff has satisfied the pleading burden imposed by Rule 23.1, which is more onerous than that demanded by Rule 12(b)(6).

To survive a Rule 12(b)(6) motion, a plaintiff need only plead so as to give notice of the claim; even vague allegations, so long as they give the opposing party notice of the claim, are well-pleaded.[9] Such vague allegations are, however, insufficient to withstand a motion to dismiss pursuant to Rule 23.1, which requires the plaintiff to allege "with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[10] A derivative action "fetters managerial prerogative" because it is the directors, not stockholders, who manage the business and affairs of a corporation, which includes determining whether to assert legal claims on behalf of the corporation.[11] Thus, Rule 23.1 requires that a shareholder first demand that the directors pursue the alleged cause of action or else satisfy "stringent requirements of factual particularity" to demonstrate that such demand would be futile.[12]

Under *Aronson*, a stockholder may proceed derivatively on behalf of the corporation without making a presuit demand upon the board if the complaint alleges particularized facts sufficient to create a reasonable doubt that, first, the directors were disinterested or independent or, second, the transaction was otherwise the product of a valid business judgment.[13] Thus, under the second prong of *Aronson*, a plaintiff may proceed with a suit against

---

7. *See, e.g., Sample v. Morgan*, 914 A.2d 647, 662 (Del.Ch.2007) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del.2001)). Even when applying the heightened pleading standards of Rule 23.1, the Court still draws reasonable inferences in favor of the plaintiff. *See Ryan v. Gifford*, 918 A.2d 341, 355 n. 34 (Del.Ch.2007).

8. *E.g., Sample*, 914 A.2d at 662 (citing *VLIW Tech., L.L.C. v. Hewlett–Packard Co.*, 840 A.2d 606, 610–11 (Del.2003)); *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985).

9. *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del.2006) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del.2002)).

10. Ct. Ch. R. 23.1(a).

11. *Caruana v. Saligman*, No. 11135, 1990 WL 212304, at *3 (Del.Ch., Dec. 21, 1990). *See also Aronson v. Lewis*, 473 A.2d 805, 811 (Del.1984); *Stone*, 911 A.2d at 366–67; 8 *Del. C.* § 141(a) ("The business and affairs of a corporation organized under this chapter shall be managed by or under the direction of a board of directors except as may be otherwise provided in this chapter or in its certificate of incorporation.").

12. *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000). A plaintiff must plead particularized factual statements akin to "ultimate facts," "principal facts," or "elemental facts." *Id.*

13. *Aronson*, 473 A.2d at 818.

a disinterested and independent board if the plaintiff pleads particularized facts sufficient to rebut the presumption of the business judgment rule by alleging a breach of fiduciary duty.[14]

Because the standard under Rule 12(b)(6) is less stringent than that under Rule 23.1,[15] a complaint that survives a motion to dismiss pursuant to Rule 23.1 will also survive a 12(b)(6) motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim.[16] In addition, the issue of whether demand is futile so as to be excused is logically antecedent to whether plaintiff states a claim because, if demand is not made or is not otherwise excused, the complaint will be dismissed without any further inquiry into the merits of the complaint.[17] Thus, this Court's analysis properly begins with the second prong of *Aronson.*

### IV. ANALYSIS

Though defendants insist that plaintiff has failed to plead particularized facts to excuse his failure to make a demand upon i2's board, I find that demand is excused as futile, as explained below. I then consider the effect of the section 102(b)(7) provision on plaintiff's claims for breach of fiduciary duty against the Director Defendants and Dubreville and for unjust enrichment against Dubreville.

### A. Demand Futility Under the Second Prong of Aronson

■ In his complaint, plaintiff alleges neither interest nor lack of independence and the parties agree that the question of demand futility is properly considered under the second prong of *Aronson.* Plaintiff avers that demand is excused as futile because the board's approval of the sale was not fully informed, not duly considered, and not made in good faith for the best interests of the Company.[18] For the reasons described below, I conclude that, because plaintiff has pleaded a duty of care violation with particularity sufficient to create a reasonable doubt that the transaction at issue was the product of a valid exercise of business judgment, demand is excused as futile.

In evaluating the decisions of boards, the courts of this State have consistently noted the limited nature of such judicial determinations of due care: "Due care in the decisionmaking context is *process* due care only."[19] Where, as here, the board has retained an expert to assist the board in its decision making process, the Delaware Supreme Court has specified that a complaint will survive a motion to dismiss in a due care case if it alleges particular-

---

**14.** *See id.* at 812. "In Delaware mere directorial approval of a transaction, absent particularized facts supporting a breach of fiduciary duty claim, or otherwise establishing the lack of independence or disinterestedness of a majority of the directors, is insufficient to excuse demand." *Id.* at 817 (internal citations omitted).

**15.** *E.g., Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del.2001) (citing *Solomon v. Pathe Commc'ns Corp.,* 672 A.2d 35, 38 (Del.1996)).

**16.** *See Ryan,* 918 A.2d at 357 ("[W]here plaintiff alleges particularized facts sufficient to

prove demand futility under the second prong of *Aronson,* that plaintiff *a fortiori* rebuts the business judgment rule for the purpose of surviving a motion to dismiss pursuant to Rule 12(b)(6)."). *See also In re Walt Disney Derivative Litig.,* 825 A.2d 275, 285 (Del.Ch. 2003).

**17.** *Aronson,* 473 A.2d at 811 (describing the demand requirement as "exist[ing] at the threshold").

**18.** Compl. ¶ 66.

**19.** *See, e.g., Brehm,* 746 A.2d at 264.

ized facts that, if proven, would show that "the subject matter ... that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice."[20] Contrary to defendants' cursory treatment of this argument, I conclude that the complaint does plead particularized facts demonstrating that material and reasonably available information was not considered by the board and that such lack of consideration constituted gross negligence, irrespective of any reliance on the Sonenshine fairness opinion.

The challenged transaction at issue—the sale of TSC to Dubreville's group—is analytically a series of discrete board actions. Plaintiff has sufficiently alleged facts to create a reasonable doubt that they, together, cannot be the product of a valid exercise of the board's business judgment. The board's first step in the series of actions culminating in the sale of TSC to Dubreville was also its most egregious: tasking Dubreville with the sale process of TSC when the board knew that Dubreville was interested in purchasing TSC. Certainly Dubreville's interest as a potential purchaser was material to the board's decision in determining to whom to assign the task of soliciting bids and offers for TSC. It would be in Dubreville's own self-interest to obtain low offers for TSC; the more diligent he was about seeking the best

offers for TSC, the higher Dubreville himself would have to bid. Had the board not known of Dubreville's interest in the sale, its decision to charge him with finding a buyer for TSC might be less perplexing. Yet, this material information was not merely reasonably available to the board, it was actually known. Dubreville had already discussed with i2 the possibility of leading a management buyout of TSC, an idea that Sidhu, Clemmer, Cash, Crandall, and McGrath discussed at the February 1, 2005 board meeting (and a topic that was later revisited during the March 9, 2005 meeting). Nevertheless, the board decided that Dubreville, whom the board knew was conflicted, would conduct the sale process.[21] From this point forward, the board's actions only exacerbated a misstep that was presumably otherwise correctable or perhaps even unactionable.[22]

Despite having tasked a potential purchaser of TSC with its sale, the board appears to have engaged in little to no oversight of that sale process, providing no check on Dubreville's half-hearted (or, worse, intentionally misdirected) efforts in soliciting bids for TSC. Dubreville's limited attempts to find a buyer for TSC did not include contacting the most obvious potential buyers: TSC's direct competitors, particularly a competitor that had previously offered as much as $25 million for TSC in 2003.[23] Perhaps unsurprisingly, Dubre-

**20.** *Id.* at 262.

**21.** In February 2005, when the board decided to place Dubreville in charge of the sale process, five of the eight Director Defendants were on the board: Sidhu, Cash, Crandall, Clemmer, and McGrath. Compl. ¶¶ 8–12. Director Defendants Wilson, Bradley, and Waterhouse did not join the board until April 2005. *Id.* ¶¶ 13–15.

**22.** *See McMillan v. Intercargo Corp.,* 768 A.2d 492, 504–05 (Del.Ch.2000) ("Although the complaint takes issue with the board's deci-

sion to conduct its search for a buyer through the nonpublic efforts of an investment banker, this is the sort of quibble that, at best, raises a due care claim under Delaware law.").

**23.** Defendants argue that it is improper to impute knowledge of the VIS/ME offer to the entire board that approved the TSC sale in 2005 because only Sidhu and Cash were directors in 2003 when VIS/ME offered to pay up to $25 million for TSC. Defendants concede that it may be a reasonable inference that Sidhu and Cash relayed this information to the rest of the board at the January 23,

ville's group emerged as the highest bidder for TSC from the sale process.

The board, during its consideration of the offers for TSC at the April 18, 2005 meeting, discussed the Sonenshine Document, which clearly described Dubreville's efforts in selectively contacting potential buyers. Thus, the Director Defendants knew that Dubreville did not contact any TSC competitors. Yet the Director Defendants did nothing to remedy the situation they created by tasking an interested purchaser with the sale of an asset of the Company. Instead, they authorized further discussions with TSH and, on April 22, 2005, signed a letter of intent for i2 to sell TSC to Dubreville and his group and, in doing so, missed another opportunity to rectify the situation they had created.

In addition, the two sets of projections described in the Sonenshine Document should have alerted the board to carefully consider whether Dubreville's offer was high enough. The Directors Defendants knew that Sonenshine's preliminary valuation of TSC was based on projections provided by management, which were pre-

pared at the direction of Dubreville. The Director Defendants therefore also knew that the valuation was calculated using these "buyer" projections. The January projections valued TSC at $6 to $10.8 million. Even the February projections, which plaintiff alleges were adjusted to make TSC appear significantly less profitable than it was, valued TSC at $3 to $7 million. Despite this, the board agreed to proceed with an offer of $3 million, which would only ultimately result in a net gain of $2.2 million because of terms in the agreement favorable to Dubreville. The entire offer of $3 million, not even considering its ultimate net value, was at the lowest end of the valuation range of TSC using even the February projections.[24]

The board's actions, to this point, are quite puzzling. In making its decisions, the board had no shortage of information that was both material—because it affected the process and ultimate result of the sale—and reasonably available (or, even, actually known as evidenced by the discussions at the board meetings): Dubreville's interest in leading a management buyout

---

2003 board meeting, but argue that five directors on the board in 2005 were not on the board at the time of that meeting. When the board determined to sell TSC in December 2004, it may not be unreasonable to infer that Sidhu or Cash communicated the VIS/ME offer to the other board members, but I do not need to make this determination. Instead, Dubreville's failure to contact VIS/ME is simply another example of a faulty process (*i.e.*, one in which no direct competitors were contacted) that was created by the Director Defendants when they decided to place Dubreville in charge of the sale process, despite knowledge of Dubreville's interest in purchasing TSC himself.

**24.** Plaintiff alleges that the price at which TSC was sold to TSH in 2005 was merely a fraction of its true value. In support of this contention, plaintiff alleges that, both before and after sale of TSC to TSH, TSC was valued at prices significantly higher than that

achieved in the 2005 sale: in 2003, VIS/ME offered up to $25 million for TSC; in early 2006, TSH refused to sell TSC for $18.5 million because it concluded that this price was too low; and, ultimately, TSC was sold in 2007 for $25 million. The "[f]airness of a price for selling assets must be judged in the light of conditions as they exist at the time of sale disregarding subsequent events," *Marks v. Wolfson,* 188 A.2d 680, 686 (Del.Ch.1963) (internal citation omitted), and the Court is well aware that an offer made in 2003 does not necessarily reflect the value of an asset in 2005. Though an inadequate price may or may not indicate an inadequacy of process, here, the inadequacy of process is clearly demonstrated by the Director Defendants' failure to consider material, known information, and so I need not consider the VIS/ME offer and the 2007 sale of TSC with respect to the "true" value of TSC at the time the board approved the sale.

of TSC; Dubreville's limited efforts in soliciting offers for TSC, including his failure to contact TSC competitors, including one he knew had previously expressed concrete interest in purchasing TSC; the circumstances under which the January and February projections were produced; the use of those projections in Sonenshine's preliminary valuations of TSC; and that TSH was a group led by Dubreville. That the board would want to consider this information seems, to me, so obvious that it is equally obvious that the Directors Defendants' failure to do so was grossly negligent.

Finally, on June 28, 2008, the board and the special committee approved the sale of TSC to Dubreville. As detailed above, plaintiff argues strenuously that the Sonenshine fairness opinion was flawed and that the Director Defendants cannot reasonably have relied on it. Because, however, I conclude that the Director Defendants' actions, culminating with the approval of the sale of TSC, were grossly negligent, I need not further consider the board's reliance on the Sonenshine fairness opinion [25] or the reliability of the opinion [26] in finding that demand is excused as futile.

### B. Failure to State a Claim

Though plaintiff has demonstrated that it would have been futile to make a demand upon the board, plaintiff fails to state a claim against the Director Defendants, who have the benefit of a section 102(b)(7) exculpatory provision in the i2 certificate, because plaintiff has not adequately alleged that the Director Defendants acted in bad faith. In contrast, however, plaintiff has stated a claim for both breach of fiduciary duty and unjust enrichment as to Dubreville. Dubreville, though he, as an officer, owes the same duties to the Company as the Director Defendants, does not benefit from the same protections as the Director Defendants because the section 102(b)(7) provision operates to exculpate only directors, not officers.

### 1. The 102(b)(7) Provision Exculpates the Director Defendants

 As authorized by Section 102(b)(7),[27] i2's certificate of incorporation contains an exculpatory provision, limiting the personal liability of directors for certain conduct.[28] Certain conduct, however, cannot be exculpated, including bad faith actions.[29] Gross negligence, in contrast, is

---

**25.** See Brehm, 746 A.2d at 262 (describing a board's failure to consider material and reasonably available information that was "so obvious" as grossly negligent "regardless of the expert's advice or lack of advice") (emphasis added).

**26.** Cf. Ash v. McCall, No. 17132, 2000 WL 1370341, at *9 n. 23 (Del.Ch. Sept.15, 2000) ("If these facts demonstrate anything, it is merely that [the accounting and financial advisors,] Deloitte [and] Bear Sterns, and [ ] management performed shoddy due diligence.").

**27.** 8 Del. C. § 102(b)(7).

**28.** The court may take judicial notice of the certificate in deciding a motion to dismiss. In re Baxter Intern., Inc. S'holders Litig., 654 A.2d 1268, 1270 (Del.Ch.1995) (citing In re

Wheelabrator Technologies Inc. S'holders Litig., No. 11495, 1992 WL 212595 (Del.Ch. Sept. 1, 1992)). Article Tenth of i2's restated certificate of incorporation provides, in part:

> To the fullest extent permitted by the Delaware General Corporation law as the same exists or as it may hereafter be amended, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.
> Ex. C to Defs.' Opening Br.

**29.** 8 Del. C. § 102(b)(7)(ii) (prohibiting the elimination or limitation of a director's liability for "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law").

exculpated because such conduct breaches the duty of care.[30] Traditionally, "[i]n the duty of care context gross negligence has been defined as 'reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason.' "[31] Recently, however, the Supreme Court has modified Delaware's understanding of the definition of gross negligence in the context of fiduciary duty. In analyzing "three different categories of fiduciary behavior [that] are candidates for the 'bad faith' pejorative label,"[32] the Court made quite clear that gross negligence cannot be such an example of bad faith conduct: "[t]here is no basis in policy, precedent or common sense that would justify dismantling the distinction between gross negligence and bad faith."[33] Instead, the Court concluded that conduct motivated by subjective bad intent and that resulting from gross negligence are at opposite ends of the spectrum.[34] The Court then considered a third category of conduct: the intentional dereliction of duty or the conscious disregard for one's responsibilities.[35] The Court determined that such misconduct must be treated as a non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith,[36] a duty that the Court later confirmed was squarely within the duty of loyalty.[37] Thus, from the sphere of actions that was once classified as grossly negligent conduct that gives rise to a violation of the duty of care, the Court has carved out one specific type of conduct—the intentional dereliction of duty or the conscious disregard for one's responsibilities—and redefined it as bad faith conduct, which results in a breach of the duty of loyalty. Therefore, Delaware's current understanding of gross negligence is conduct that constitutes reckless indifference or actions that are without the bounds of reason.

The conduct of the Director Defendants here fits precisely within this revised understanding of gross negligence. In finding that demand is excused as futile, I have already concluded that plaintiff has pleaded with particularity so as to raise a reasonable doubt that the actions of the board were a product of the valid exercise of their business judgment. Thus, for the reasons explained above, the Director Defendants' actions, beginning with placing Dubreville in charge of the sale process of

30. *See In re Walt Disney Co. Derivative Litig.,* 906 A.2d at 67 ("[Section 102(b)(7)(ii)] exculpates directors only for conduct amounting to gross negligence"); *id.* at 65 ("Section 102(b)(7) of the DGCL ... authorizes Delaware corporations, by a provision in the certificate of incorporation, to exculpate their directors from monetary damage liability for a breach of the duty of care.").

31. *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 891 A.2d 150, 192 (Del.2005) citing *Tomczak v. Morton Thiokol, Inc.,* No. 7861, 1990 WL 42607, at *12 (Del.Ch. Apr. 5, 1990) (internal quotations omitted).

32. *In re Walt Disney Co. Derivative Litig.,* 906 A.2d at 64–65.

33. *Id.* at 66. *See also id.* at 64–65 ("[W]e address the issue of whether gross negligence

(including a failure to inform one's self of available material facts), without more, can constitute bad faith." The answer is clearly "no.").

34. *Id.* at 64–65.

35. *Id.* at 66–68.

36. *In re Walt Disney Co. Derivative Litig.,* 906 A.2d 27, 66 (Del.2006).

37. *Stone,* 911 A.2d at 369–70 (quoting *Guttman v. Huang,* 823 A.2d 492, 506 n. 34 (Del. Ch.2003)). *See also id.* at 370 ("[T]he fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith.").

TSC and continuing through their failure to act in any way so as to ensure that the sale process employed was thorough and complete, are properly characterized as either recklessly indifferent or unreasonable. Plaintiff has not, however, sufficiently alleged that the Director Defendants acted in bad faith through a conscious disregard for their duties. Instead, plaintiff has ably pleaded that the Director Defendants quite clearly were not careful enough in the discharge of their duties—that is, they acted with gross negligence or else reckless indifference. Because such conduct breaches the Director Defendants' duty of care, this violation is exculpated by the Section 102(b)(7) provision in the Company's charter and therefore the Director Defendants' motion to dismiss for failure to state a claim must be granted.

### 2. No Exculpatory Protection for Dubreville

■ At this point, I pause to note the perhaps unusual circumstances of this case. Here, plaintiff has alleged with particularity that the Director Defendants breached their duties of care so as to rebut

the business judgment rule, thereby demonstrating that demand is excused as futile. The Company's certificate, however, contains an exculpatory provision authorized by Section 102(b)(7), shielding the Director Defendants from liability for that conduct.[38] Thus, ordinarily, the motion to dismiss would be granted in its entirety. Here, however, Dubreville also moves for dismissal pursuant to Rules 23.1 and 12(b)(6).[39] I have already concluded that demand is excused as futile, meaning that plaintiff has the right to prosecute this litigation on behalf of the Company. As decided above, the case cannot go forward against the Director Defendants because they are exculpated by virtue of the i2 certificate. As against Dubreville, however, the claim for breach of fiduciary duty may, without a doubt, proceed.

Though an officer owes to the corporation identical fiduciary duties of care and loyalty as owed by directors,[40] an officer does not benefit from the protections of a Section 102(b)(7) exculpatory provision, which are only available to directors.[41] Thus, so long as plaintiff has alleged a

---

**38.** *Benihana of Tokyo, Inc.*, 891 A.2d at 192 (citing *In re Walt Disney Co. Derivative Litig.*, 907 A.2d at 750) ("Because duty of care violations are actionable only if the directors acted with gross negligence, and because in most instances money damages are unavailable to a plaintiff who theoretically could prove a duty of care violation, such violations are rarely found.").

**39.** Dubreville is not represented by separate counsel; he and the Director Defendants share counsel, though counsel argues in support of its motion that plaintiff's complaint "amounts to a tale of subterfuge" and fraud committed by Dubreville. Defs.' Reply Br. at 17. If, as counsel contends, "Plaintiff's argument in his brief that the Board consciously disregarded their responsibilities cannot be reconciled with his allegations in the Complaint about how Dubreville allegedly concealed facts concerning the sale," *id.* at 3, then surely also counsel cannot simultaneous-

ly rely on the complaint's assertions that Dubreville defrauded the board or was a thief and also move for dismissal of the counts asserted against Dubreville.

**40.** *Ryan v. Gifford*, 935 A.2d 258, 269 (Del.Ch. 2007) (citing *In re Walt Disney Co.*, No. 15452, 2004 WL 2050138, at *3 (Del.Ch. Sept. 10, 2004)) ("The fiduciary duties an officer owes to the corporation 'have been assumed to be identical to those of directors.'"). *See also* Lyman Johnson, *Recalling Why Corporate Officers Are Fiduciaries*, 46 WM. & MARY L.REV. 1597 (2005).

**41.** *See* 8 *Del. C.* § 102(b)(7) ("A provision eliminating or limiting the personal liability of a *director* to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a *director*, provided that such provision shall not eliminate or limit the liability of a *director* ....") (emphasis added).

violation of care or loyalty, the complaint proceeds against Dubreville. Here, plaintiff has more than sufficiently alleged a breach of fiduciary duty and defendants have done nothing to meet their burden of demonstrating with reasonable certainty that, under any set of facts that could be proven to support his claim for breach of fiduciary duty, plaintiff would not be entitled to the relief sought. I have no difficulty in concluding, based on plaintiff's allegations of wrongdoing by Dubreville and defendants' wholly inadequate arguments, which explicitly concede that the complaint states a claim,[42] that the motion to dismiss Count I (breach of fiduciary duty) as to Dubreville must be denied.

### C. Unjust Enrichment

 Plaintiff alleges that, as a result of his manipulative conduct, Dubreville has been unjustly enriched at the expense of the Company. Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience."[43] Defendants' sole argument is that an unjust enrichment claim cannot lie against Dubreville because the parties' rights are governed by a contract, here, the letter of intent.[44] Defendants argue that this claim must be dismissed because the sale of TSC was governed by a contract between Dubreville and the Company and the contrast must be "the measure of [the] plaintiff's right."[45] This argument neither makes it reasonably certain that plaintiff would not be entitled to the relief sought nor squarely addresses the gravamen of plaintiff's unjust enrichment claim. Plaintiff alleges that it is the letter of intent, itself, that is the unjust enrichment; that is, Dubreville's manipulative conduct (which defendants concede)[46] unjustly enriched him in the form of the contract for the sale of TSC to TSH. Moreover, even if there is a contract between Dubreville and i2, which I do not decide, defendants' argument that plaintiff has conflated the unjust enrichment claim and the breach of fiduciary claim is unavailing. If plaintiff has pleaded and then prevails in demonstrating that the same conduct results in both liability for breach of Dubreville's fiduciary duties and disgorgement via unjust enrichment, plaintiff then will have to elect his remedies. But, at this time, defendants have again wholly failed to satisfy their

---

**42.** See, e.g., Defs.' Reply Br. at 4 ("[T]he Plaintiff faults the Board for relying upon the Sonenshine Fairness Opinion because the opinion included projections for TSC that Dubreville allegedly manipulated downward."); id. at 14 ("[T]he Complaint is more accurately described as a tale of Dubreville intentionally hiding that information [about alternative offers]."); id. at 17 (arguing that, even if the sale price of TSC was a "steal," the complaint asserts that Dubreville was a "thief"); id. at 17–18 ("[T]he Complaint alleges a long list of Dubreville's purported efforts to conceal from i2 and Sonenshine facts about the actual value of TSC, and deliberately mislead both the Board and Sonenshine about TSC's actual worth.") (citing paragraphs in the complaint).

**43.** Fleer Corp. v. Topps Chewing Gum, Inc., 539 A.2d 1060, 1062 (Del.1988).

**44.** Defendants do not otherwise challenge that plaintiff has stated a claim for unjust enrichment, the elements of which are: (1) unjust enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) the absence of justification; and (5) the absence of a remedy at law. Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 393 (Del.Ch.1999) (internal citation omitted).

**45.** See MetCap Securities L.L.C. v. Pearl Senior Care, Inc., No. 2129–VCN, 2007 WL 1498989, at *5 (May 16, 2007) (alteration in original and internal citations omitted).

**46.** See supra n. 42.

burden to justify dismissal of this count. Therefore, defendants' motion to dismiss the unjust enrichment claim is denied.

## V. CONCLUSION

Though this board acted "badly"—with gross negligence—and in doing so provided the basis for my denial of defendants' motion to dismiss pursuant to Rule 23.1, this board did not act in bad faith. Therefore, with the benefit of the protections of the Company's exculpatory provision, the motion to dismiss Count I (breach of fiduciary duty) pursuant to Rule 12(b)(6) is granted as to the Director Defendants. Defendants' Rule 12(b)(6) motion is, however, flatly denied as to Dubreville as to Count I. The motion is also denied as to Count II (unjust enrichment).

IT IS SO ORDERED.