# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| Triple H Family Limited Partnership, a Delaware limited partnership, | ) ) ) | |
| Plaintiff and Counterclaim Defendant, | ) ) ) ) | |
| v. | ) ) | C.A. No. 12294-VCMR |
| Jerry Neal, | ) ) | |
| Defendant and Counterclaim Plaintiff, | ) ) ) | |
| v. | ) ) | |
| Jeffrey A. Hoops, | ) ) | |
| Counterclaim Defendant, | ) ) | |
| and | ) ) | |
| Omni Insurance Group, LLC, a Delaware limited liability company, | ) ) ) | |
| Nominal Defendant and Counterclaim Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: April 19, 2018
Date Decided: July 31, 2018

David B. Anthony and Sean A. Meluney, BERGER HARRIS LLP, Wilmington, Delaware; *Attorneys for Plaintiff and Counterclaim Defendants.*

Robert J. Katzenstein and Clarissa R. Chenoweth, SMITH, KATZENSTEN & JENKINS LLP, Wilmington, Delaware; *Attorneys for Defendant and Counterclaim Plaintiff.*

**MONTGOMERY-REEVES, Vice Chancellor.**

In August 2014, two old friends decided to start an insurance agency together. They had high hopes of a mutually beneficial relationship, but these hopes were quickly dashed. Almost two months to the day from the inception of their arrangement, the parties agreed to dissolve their business. The parties differ in their opinion on the cause of the failure; one side claiming incompetence and the other hubris. In fact, the parties differ in their opinion on pretty much everything pertaining to this litigation, much as they differed on pretty much everything during their business venture.

Unfortunately, the failed venture created bad blood between the two friends. This litigation was filed after months of fighting over how to unwind their business. The plaintiff seeks damages for breach of contract and breach of fiduciary duty as well as judicial dissolution of the limited liability company involved. The defendant seeks damages for breach of contract, breach of fiduciary duty, and fraud. I find that the defendant breached the contract and breached his fiduciary duties, and the plaintiff did not breach the contract, breach his fiduciary duties, or commit fraud. Finally, judicial dissolution is not necessary because the parties already agreed to dissolve the limited liability company. Instead, I order that the limited liability company be wound up.

## I.  BACKGROUND

Below are my findings of fact based on the parties' stipulations, over 300 trial exhibits, and the testimony of six live witnesses during a three-day trial.[1]

### A.  Parties and Relevant Non-Parties

Plaintiff and Counterclaim Defendant Triple H Family Limited Partnership ("Triple H") is ninety-nine percent owned by Hoops Family Dynasty Trust, which is controlled by Jeffrey Hoops's three adult sons, and one percent owned by its general partner, Milton Management.[2]  Triple H is a holding company for investments made by Milton Management, which is controlled by Jeffrey Hoops.[3]

Counterclaim Defendant Jeffrey Hoops ("Hoops") has worked in coal mining for more than forty years.[4]  Hoops started several coal mining businesses during his

---

[1]  Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text.  Joint Trial Exhibits are cited as "JX #," and facts drawn from the parties' Joint Pretrial Stipulation and Order are cited as "PTO #."  Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.  After being identified initially, individuals are referenced herein by their surnames without honorifics or regard to formal titles such as "Doctor." No disrespect is intended.

[2]  PTO ¶¶ 12, 13.  For the sake of efficiency, I refer to Triple H and Hoops collectively as "Plaintiff."

[3]  *Id.* ¶ 12; Tr. 44 (Hoops).

[4]  *See* PTO ¶ 6.

2

career and currently runs Revelation Energy LLC ("Revelation"), a coal mining business he started in 2008.[5]

Defendant and Counterclaim Plaintiff Jerry Neal ("Neal" or "Defendant") is an insurance agent residing in West Virginia. He has worked in the insurance business for almost thirty years,[6] and in 2011 he formed his own insurance business called Neal Insurance.[7]

Omni Insurance Group, LLC ("Omni") is a Delaware LLC organized by Hoops on August 25, 2014.[8] Triple H and Neal both own fifty percent of Omni.[9]

## B. Credibility

I accord the evidence the weight and credibility I find it deserves. There are several conflicts between the contemporaneous documents and the live witness testimony given three years after the fact. I tend to give more weight to the contemporaneous evidence as it is free from the realities of litigation and closer in time to the events that transpired. Additionally, the contemporaneous written evidence and live witness testimony in this case show a clear pattern of behavior on

---

[5] Tr. 17 (Hoops).

[6] *See* PTO ¶ 4.

[7] *Id.* ¶ 5.

[8] *Id.* ¶ 1.

[9] *Id.* ¶ 2.

the part of both Hoops and Neal that greatly influenced the credibility of each. On the one hand, Hoops is a seasoned businessman who seems to move with breakneck speed when it comes to making business decisions. But Hoops also has a strong personal code of ethics and believes a man's word is his bond.[10] Neal, on the other hand, is the perpetual salesman who will say whatever he needs to, regardless of veracity, in order to secure the deal and who continuously tries to renegotiate deals to get more favorable terms for himself.[11] These characteristics are repeatedly

---

[10] *See, e.g.*, JX 17 (setting up Omni within days of coming up with the idea with Neal); JX 57 (refusing to move insurance away from Van Meter, even for a cheaper rate, because "they done the right thing when it would have been easy for them to say no"); JX 69 ("I sincerely apologize for his actions as I would never want to be in business with anyone that conducts themselves in this manner."); JX 72 ("It is clear you do not think much of Heather and I know little about insurance, but she has done a great job for us the past 6 years and with all she and Joe are involved in for us, I cannot cut her loose."); JX 72 (agreeing to stick to the terms of his deal with Neal even after Neal failed to secure insurance twice in ten days); JX 86 (agreeing to pay the ten percent penalty on Neal withdrawing money from 401K to keep Neal "whole").

[11] *See, e.g.*, JX 23 (attempting to renegotiate the terms of Omni to keep Neal Insurance bond and consulting income exclusively for himself); JX 54 (telling Hoops less than twenty-four hours before his personal policies lapsed, despite multiple assurances to the contrary, that Neal did not succeed in getting Hoops's assets covered); JX 72 (attempting to renegotiate the terms of Omni's dissolution); JX 222 (opening a JP Morgan Bank account without Hoops's knowledge to redirect Omni's biggest commissions). *Compare* JX 90 (representing to West Virginia Offices of the Insurance Commissioner that he is the sole managing member of Omni in order to report Hoops and Black Diamond to the Insurance Commissioner) *with* Tr. 454 (Neal) (testifying after suing Hoops for breach of fiduciary duty that, "I don't think that as it was unfolded and what we truly ended up doing, I was the sole manager, no."); *compare* JX 25 (representing on September 1, 2014, that Neal did not have "a single Neal Insurance policy renewing" until after December 31, 2014) *with* JX 326 (invoicing November 18, 2014 renewals); *compare* JX 47 (telling Hoops that "[a]ll coverages are bound, went into effect at midnight on Sunday morning") *with*

reaffirmed by the evidence; thus, when contemporaneous written evidence is lacking and Neal's and Hoops's testimony conflicts, I tend to give Hoops's testimony more weight.

## C. Facts

Neal and Hoops attended high school together in West Virginia.[12]  In August 2014, they both attended their fortieth high school reunion.[13]  During the course of the second night of the reunion, the two men discussed a shared acquaintance in the coal industry who had started an insurance agency.[14]  This idea appealed to Hoops as a way of recouping some of the money he spent on insurance premiums each year. From Neal's perspective, Hoops's business and personal insurance would generate very lucrative commissions.  Forming an insurance agency together would be a mutually beneficial endeavor, and the two men left the reunion excited about the prospect.[15]

---

JX 310 (emailing an insurance broker minutes after JX 47 was sent asking if the policy is bound and saying he is "[v]ery concerned we are exposed").

[12]   PTO ¶ 3.

[13]   *Id.* ¶ 8.

[14]   Tr. 27 (Hoops).

[15]   JX 7.  I make no determination as to the legality of their venture.

5

### 1. Initial conversations about forming Omni: August 18-25, 2014

On August 18 and 19, 2014, Neal and Hoops exchanged emails discussing the preliminary plans for starting an insurance agency together.[16] On August 20 at 12:53 p.m., Hoops sent the following email (the "August 20 Email") to his long-time personal lawyer Edward "Eddie" Cunningham:

> Eddie:
>
> Looking to diversify a little as I just completed a meeting with Jerry Neal a lifelong friend and business acquaintance as we finalized the plans to move forward with forming a new Insurance Agency. Would appreciate you pullingtogther our normal operating agreement with the ownership to be structured as follows:
>
> 1) New Entity Name
>   a. Omni Insurance Group (if available)
>   b. Assume we will register in Delaware, then get set up to do business in WV, KY, TN, VA, and OH.
> 2) Owner
>   a. Jerry Neal
>   b. Triple H Family LP will have a 50% Net Profits Interest with an option to convert that to 50% of the stock in the future.
>     i. Will have 50% voting rights on decisions.
>
> Jerry has a base of business already that will move into the entity and he will be provided a Base Salary plus Benefits as President and CEO of the business. Jerry has all of the

---

[16] JX 9–JX 13.

necessary licenses required to underwrite insurance and if there are any nuances to forming an Agency please let me know as we were not aware of any.

Sandy:

If you are aware of anything we need to be concerned about, please advise.

Lisa:

Initially there will be minimal back office work, so if you can set up a GL for this that would be great. Ultimately we will need Alpha to set up a web page and other IT things we may need for such a venture. Once Eddie has is set up with an Operating Agreement and FEIN, please set up a bank account at United Bank for this entity.

We would like to have everything in place and start rolling Jerry's other business into this entity by October 1 and he will go on salary at that point. We can make a loan from Triple H to this entity for the initial working capital that might be required. Ultimately Jerry will build out an office staff, but will run lean initially.

Let us know if you have any questions or need any additional information … Thanks … Jeff[17]

---

[17]     JX 16. Quotes from trial testimony and email exhibits are presented in their original form except where indicated. I chose not to include *sic* because it would make some of the testimony and emails unreadable.

The August 20 Email was cc'd to Neal, Lisa Henson, and Sandy Thomas.[18] Lisa Henson was the CFO of Revelation,[19] and Sandy Thomas is a tax expert.[20]

Neal replied all to the August 20 Email at 7:04 p.m. on August 20, "Thanks Jeff. Let me know what you need from me Eddie. I can license the Agency with the various State Insurance Departments if you want me to. Thanks."[21] On August 21 at 1:27 p.m., Thomas replied all to the August 20 Email to explain that "if Jerry is the only member of the LLC it will be a single member LLC and a disregarded entity for tax."[22] Based on this advice, as well as Cunningham's legal research on who could own an insurance agency, Hoops replied all to Thomas at 1:41 p.m. on the same day, "Those are good points, so let's go ahead and make Triple H a member and we can pay Jerry from LLC and bill it to Omni so he will not have to deal with the Quarterly Tax issue."[23]

---

[18]     JX 14.

[19]     Tr. 59 (Hoops).

[20]     Tr. 39 (Hoops).

[21]     JX 14.

[22]     *Id.*

[23]     Tr. 43 (Hoops); JX 16.

8

On August 22 at 9:36 a.m., Neal sent an email to his accountant Bob Toler.[24]

The email stated:

> Very Confidential.
> Need your thoughts about new Insurance Agency that is being set up with me as President and Jeff Hoops as 50% owner. Please look at below and let's discuss. Eddie is Jeff's attorney who sets up his business ventures etc.
> Jeff is rolling in all his business plus another three or four times that in associated business that he has ties to.[25]

The email also included the August 20 Email, Thomas's response from August 21 at 1:27 p.m., and Hoops's response to Thomas at 1:41 p.m.[26] Toler replied at 10:29 a.m. on August 22, "Even if they make the other entity a member you cannot received salary or wages from the LLC. You will receive guaranteed payments to a partner and pay estimated taxes accordingly. A member of an LLC can't be an employee of the LLC."[27]

On August 22 at 1:41 p.m., Hoops informed Neal via email that "Omni is available in Delaware and West Virginia, so Eddie is going to proceed with getting us set up in Delaware, then we will register to do business under that name in WV

---

[24] JX 19.

[25] *Id.*

[26] *Id.*

[27] *Id.*

9

where the main office will be located. Looks like everything is coming together."[28]

On August 25, 2014, Hoops, as organizer, executed the Certificate of Formation for Omni creating the Delaware LLC.[29]

### 2. The push to get Omni off the ground and Revelation's policies renewed before they lapsed: September 1-30, 2014

In the insurance world, agents make commissions, which are a percentage of the premium paid by the customer. Hoops was under the impression that Omni would earn $600,000 a year in commissions just from Revelation's insurance policies.[30] Triple H would then be entitled to fifty percent of those commissions after expenses as a fifty percent owner of Omni. Securing these commissions came with a hitch, however. Revelation's insurance policies were yearlong policies that ran from October 5 to October 5.[31] All of Revelation's policies would be renewing on October 5, and in order to secure the 2014-2015 commissions, Omni would have to be the agent of record and place those policies.[32]

---

[28]   JX 20.

[29]   JX 21.

[30]   Tr. 35 (Hoops). In actuality, Omni received a little over $300,000 in commissions for the 2014-2015 year because the insurance policies were placed using brokers rather than directly with the carriers. Tr. 56 (Hoops).

[31]   Tr. 28 (Hoops).

[32]   *See* Tr. 111, 118-19 (Hoops) (explaining that the Agent of Record at the time the policy is placed is entitled to the commissions for the entire term of that policy regardless of any later changes to the Agent of Record).

Normally, an insurance agent would start to look for those renewal policies three months in advance, or July for policies renewing in October.[33]  Hoops had a meeting set up with his current insurance broker, Van Meter Insurance Group ("Van Meter") for September 24, 2014.[34]  Since Omni was created on August 25, it was generally understood that having Omni handle the renewal of Revelation's policies would be challenging.[35]  Hoops's personal policies, securing $15 million in assets, were up for renewal on October 15, which further compounded the amount of work required by Neal and Omni in a very short amount of time.

On September 1, 2014, Neal wrote to Hoops:

> I need to focus on getting everything moved by 10-5 or so.
> Best if I do it from here for at least a few weeks.
> Thinking of farming out your personal policies to agent here who is really good.   50/50 split maybe on commission.  Hopefully for just this year.  You OK with that?
>
> Assuming premiums same or better.   Going to get appointed with current carriers but might be tough in 30 days.[36]

---

[33]    Tr. 28 (Hoops); JX 9.

[34]    JX 9.

[35]    Tr. 56 (Hoops).

[36]    JX 25.

On top of all the work required to place Revelation's and Hoops's insurance policies by the renewal dates, there was significant work required just to set up Omni to function as an insurance agency. In the same September 1 email, Neal also wrote:

> I hope to have the Errors and Omissions Insurance in place tomorrow. Will need about $5000 to pay for the year. Next is getting Broker/Agency Appointments. Will need W9-FEIN. Hope we can get it tomorrow. Will this be Eddie, Lisa, or me?
>
> Need to get Business licensed in WV so I can do same with Insurance Commissioner.
>
> E&O carriers will not do business in Delaware. I had to change address on applications. I used my address and phone number. We can change easily and will.[37]

Adding even further strain was the fact that Neal kept attempting to renegotiate the structure and operation of Omni. In the same September 1 email above, Neal also wrote:

> I don't think I have a single Neal Insurance policy renewing between now and 12-31-14. All are done already. Nothing really gained by moving them until renewal.
>
> I do have some Consulting fees coming up which do not involve any contracts or agreements with any company, Brook and SM included. I get paid a fee for getting the bonds and keeping the bonds placed. Two customers. Ungureans and one small bond in Pa. I would need to discuss with them which I really don't want to do. I don't want to discuss with Brook either although there is no

---

[37] *Id.*

12

arrangement with him other thatn fact that he knows that I get something on a fee basis.

I would like to leave these alone for now and also keep Neal Insurance operating mainly for reason to place something that we might not be able to do with Omni. Heather mentioned this in a way.
I am going to need the income from the Consulting this year.

Guessing, but Revelation probably pays quarterly installments that are interest free. If so, we might get only get a quarter of the commission this year. My half added to 3 months of dray might leave me a little short for the year.

Most important thing is that I absolutely will not do any new business in Neal Insurance after Oct. 1 unless you and I agree before hand and have a good reason. My thinking is by first quarter of next year my business will be an insignificant portion of my income comparted to Omni and I will want to roll it in. We can discuss further if we need to. I don't want this to be an issue with you at all. I will show all records for this and past years.[38]

But Hoops wanted to maintain their original agreement. He replied several hours later:

Thought we had discussed and agreed on many of these things as here was my understanding
1) Fine with considering sharing or leasing office space with Ron but want to clearly understand and formalize the relationship
2) the FEIN can be done on line if it is not done already I will make sure it gets done tomorrow
3) I can have Lisa register us on line in WV

---

[38]     *Id.*

13

4) Omni Insurance Group, LLC address is 1051 Main Street, Milton, WV 25541
5) as discussed I am not hung up on where you work from
6) had thought we could do personal policies as they are a month behind others, but if that is all we can do then we have no choice. They are October 25th
7) copy me on request to Heather and I will follow up as well.
8) understood we were going to do the following
   - roll all of your current income into Omni
   - you would draw salary of $100K, vehicle, and health insurance
   - 50% ownership
   - Commissions on my business along could be as much as $600,000

I went into this with the understanding it was all going to roll together and we were going to be 100% focused on growing Omni. If that does not work for you that is fine and need to know now so we can go in another direction.[39]

Neal quickly backed off. He replied, in relevant part, the next day, September 2 at 9:23 a.m.:

I am 100% committed to growing Omni.
I will roll Neal Insurance beginning in October. Maybe a short term perspective on my part.
I will feel better when it is clear that I have Oct. 5 covered.
Most of concerns are on my end.
I want to handle your Personal [insurance] and will if I can get proper markets. Inside of 60 days which is a minimum for some markets to quote.
Total Personal premium for 8 policies is about $18,959.69.
About $3800 commission.[40]

---

[39]     *Id.*

[40]     *Id.*

14

Hoops replied:

> No issue with you maintaining Neal Insurance entity in the even we would need it for separation. My intent is to be a silent partner and unless it is an account I can help land, everyone else will see it as your company.
>
> Agree the personal is not a big part of what we are doing.
>
> Thought based on your conversation with Jim last week you were confident you could get everything done. Agree getting business covered is critical and if you see that cannot be done, then we pull the plug on everything and go back to the way it is right now.[41]

Throughout September 2014, Neal and Hoops continued to try to place Revelation's and Hoops's insurance policies, get Omni running, and discuss their business relationship. Central to all of this was Heather Hammond.

Hammond began working in the coal industry nineteen years ago at Jacobs Risk Management, helping to prepare mine plans for the Mine Safety and Health Administration.[42] Jacobs Risk Management assists small and large coal companies with regulatory affairs and insurance needs;[43] it had serviced Revelation's and

---

[41]     *Id.*

[42]     Tr. 479 (Hammond).

[43]     Tr. 552 (Jacobs).

15

Hoops's insurance policies since 2009.[44]  Jacobs Risk Management was contracted to work with Van Meter to place the insurance policies.[45]

When Hoops and Neal first decided to form Omni, they met with Hammond and Joseph Jacobs,[46] the owner of Jacobs Risk Management.[47]  At that meeting, Neal and Hoops asked Hammond and Jacobs to help with the transition into Omni and for help with future administrative work.[48]  They all agreed that "Jacobs Risk Management would receive a commission on current business of Revelation as well as commission on any new business that's brought to the table."[49]  Hammond continued to work with Neal through September, assisting with renewing Revelation's policies.[50]  She provided Neal with renewal paperwork to be submitted to insurance carriers, helped new carriers conduct site visits with Jacobs, and provided additional information to Neal as needed.[51]

---

[44]     Tr. 485 (Hammond); Tr. 553 (Jacobs).

[45]     Tr. 485 (Hammond); JX 4.

[46]     Tr. 486 (Hammond); JX 26.

[47]     Tr. 19 (Hoops).

[48]     Tr. 486 (Hammond).

[49]     Tr. 487 (Hammond); *see also* JX 26; Tr. 37 (Hoops); JX 41, at JN00015354.

[50]     *See* JX 26; JX 32.

[51]     Tr. 280-81 (Neal); Tr. 491-95 (Hammond).

The relationship between Neal and Hammond was strained almost immediately.[52] Neal felt that Hammond was not providing him with the type of cooperation he was expecting,[53] and Hammond felt that Neal treated her like he was superior to her or like she was " lower class."[54] Despite this tension, Hammond and Neal continued to work towards renewal of Revelation's policies, sending out Agent of Record letters and getting insurance quotes.[55]

On September 22, 2014, Cunningham sent a proposed operating agreement for Omni, a proposed employment agreement for Neal, and a proposed member agreement for Omni to Hoops and Neal. Neal never signed these agreements.[56]

### 3. Things fall apart: October 1-31, 2014

On October 1, 2014, Neal emailed Hoops saying, "We did it. I have everything done."[57] Neal then walked through the particulars of the different insurance policies, including workers' compensation, director and officer ("D&O"), crime, and excess

---

[52]    JX 27; JX 28; Tr. 282-83 (Neal); Tr. 496 (Hammond).

[53]    Tr. 283 (Neal).

[54]    Tr. 496 (Hammond).

[55]    JX 32; JX 34; JX 35.

[56]    Tr. 330, 347-48 (Neal).

[57]    JX 41.

17

insurances.[58]  Hoops replied, "Amazing you got all of this pulled together in such a short time, great job."[59]   The celebrations continued on October 3,[60] but the celebrations were short lived.  On October 4, a Saturday, Neal emailed Hoops at 6:02 p.m., "I was not able to get the policy number on the D&O from the wholesaler representing Westchester.  The wholesaler said there was a concern with the questions on Friday."[61]  Hoops replied at 6:20 p.m., "Are we going to be without insurance for some period of time now?  Having coverage is more important than anything else as I would not Want to e itch out insurance for one minute as we have people on our jobs 24/7."[62]  Neal assured Hoops that everything was likely fine, writing, "Most likely someone of authority with Westchester was out Friday afternoon and upon return Monday morning will approve and coverage will be in effect midnight Sunday morning – 10-05-14 as if nothing happened."[63]  Hoops replied, "I would have submitted financing without D&O as I would never take the chance of not having liability and equipment coverage.  Will anything be covered as

---

[58]      *Id.*

[59]      *Id.*

[60]      JX 46.

[61]      JX 47.

[62]      *Id.*

[63]      *Id.*

18

of midnight tomorrow night? If not I would shut the operations down until something is in place. That cost us about $1.1mm per day."[64]

At 8:18 a.m. on Monday, October 6, Neal assured Hoops again that, "All coverages are bound, went into effect at midnight Sunday morning. I have the policy numbers for them except the D&O."[65] At 8:20 a.m., Neal emailed the D&O insurance intermediary asking, "Are we bound? No policy number or word Friday. Very concerned that we are exposed. Please advise asap. Customer is not happy with me about this."[66] The intermediary responded at 10:13 a.m. that the underwriter and carrier both had additional questions as of Monday, October 6. At 9:37 a.m. on October 6, Neal emailed a different intermediary to see if they could give him a quote for D&O insurance.[67] On October 8 at 9:58 a.m., Neal emailed yet another underwriter, "I have a pressing need to get D&O in place on [Revelation]. Westchester is stalling and have not bound. They offered renewal terms but have

---

[64]    *Id.*

[65]    *Id.*

[66]    JX 310.

[67]    JX 48.

refused to bind through Crump."[68]   At some point after this October 8 email, Westchester bound the D&O insurance effective October 5, 2014.[69]

Less than ten days later, on October 14 at 9:20 a.m., Neal emailed Hoops, Henson, and Hammond, "Your [Hoops] personal policies come due tomorrow, so we need to bind today.  I was not successful in getting all policies policies replaced with my agent here as I had hoped to do . . . The best option is to renew with VMI unless they refuse."[70]  At 10:17 a.m., Hammond replied all, "I have some pretty good pricing on your personal lines.  I'll email you some options to look at."[71]

At 4:29 p.m., Hoops emailed Neal and cc'd Henson and Hammond, but the email was addressed to Hammond.  It read, "Heather Just do whatever it takes to make sure I have coverage disappointed only 1 hour notice as that that just does not work."[72]   At 4:33 p.m., Neal emailed Hoops, Hammond, and Henson, "My experience is that companies will bind effective of the day of the instruction to bind especially if it is a renewal, so we could bind tomorrow effective 10-15.  However it might be trouble getting a claim paid in the window of midnight to whenever we

---

[68]     JX 60.

[69]     Tr. 161 (Hoops); Tr. 275 (Neal).

[70]     JX 53.

[71]     JX 54.

[72]     *Id.*

20

send order to bind."[73]  At 4:38 p.m., Hoops replied "24 hours of exposure is unacceptable this is no way to do business."[74]  At 4:57 p.m., Hammond emailed Neal, "I'll be heading out of the office soon.  Do I need to do anything to help on this?"[75]  Neal responded at 5:01 p.m., "Yes, Bind all with [Van Meter] before you leave.  Send clear email that coverage will be effective 10-15-14.  A return acknowledgment would also be good."[76]  Van Meter, from whom Omni had just taken all of Revelation's insurance, ended up placing Hoops's personal insurance with almost no notice.[77]

The parties did not submit contemporaneous written evidence that illuminates the events of October 15-17 as clearly as the other events in this case.  Hoops testified that on October 15, he and Neal agreed "Omni would be dissolved and that we would go our separate ways and that we would split the commissions for the next year 50-50."[78]  On October 16 at 1:19 p.m., Neal wrote, in part:

---

[73]     *Id.*

[74]     *Id.*

[75]     *Id.*

[76]     *Id.*

[77]     JX 73.

[78]     Tr. 78 (Hoops).

Lisa needs to issue check for 25% today.  Ok?

I would like to get the carriers aid their portion of the 25% today, or as many of the 9 as possible.  Ok?

The balance of the 25% down is Omni commission.  I would like to get a check for half as we agreed.  I will see if Lisa put any money in a new 401K and I will subtract that out.  KEMI commission is the most part of the commission, about 40%, and is not financed as you know. We can use that commission to settle on for whatever expenses come out etc. including any monthly if we need to.

I advised Lisa to max my 401K and planned on taking money out to live on.  Regardless of how or whether we change our Omni concept.  We are in agreement on a 50/50 split for this year.  Correct?[79]

Hoops replied, "Lisa has been waiting to give you a check for nearly 2 weeks. Believe I want to go direction I laid out yesterday."[80]

In the morning on October 17, Neal, Hoops, and Henson met at Hoops's office.  Originally, Henson and Neal were meeting to sign the financing agreement that would govern the financing for the premiums that Revelation needed to pay.[81] Hoops testified that Henson called him down to her office to address an issue.[82]  He

---

[79]  JX 61.

[80]  *Id.*

[81]  *See* JX 64.

[82]  Tr. 81 (Hoops).

22

further testified that he went down to her office, and she told him that Neal was refusing to sign the finance agreement "which is obviously required in order to get the additional premiums that are necessary to be paid to the underwriter. So without that, we would not have insurance coverage"[83] unless Henson wrote "him a check for the full commissions at the time, which were $200,000."[84] Hoops testified that he told Neal, "'Jerry, our deal was 50-50. You don't get all the commissions. It's 50-50.' So eventually we agreed that we would distribute $150,000. And so 75,000 was given to Jerry and 75,000 was given to Triple H Family Limited Partnership, leaving about $50,000 in Omni at that time."[85] Neal testified:

> [Hoops] threw out a 75,000 distribution for each of us. Which, when I went in there, I just needed some money. I didn't even know that we had to do a distribution for me to get a little bit of money. But in reality, the business sense of it was that we probably did both have to take a distribution, as he said. And then he said 75 K. I said, Okay, fine. It didn't last a minute, and that was the end of that.[86]

At 8:55 a.m. on October 17, Hoops emailed Hammond, Jacobs, and Henson:

> I told him this morning we are done and guess this will probably work out for the best as if you guys are Interested, then my plan is as follows:

---

[83] *Id.*

[84] *Id.*

[85] Tr. 82 (Hoops).

[86] Tr. 299 (Neal).

23

1) Agree to give Jerry 50% of the commission for this year on Revelation Energy less expenses including the 10% to you.
2) He will sign over his 50% ownership in Omni
3) Then assuming this goes as planned I would envision you guys taking 50% ownership in Omni and we will work together to grow this business.[87]

At 9:15 a.m., twenty minutes later, Hoops emailed Neal and Henson:

As you know on September 1, 2014 we agreed to the following structure for Omni:
1) Omni owned 50/50 by you and Triple H family LP
2) You would be paid a salary of $100K per year plus benefits to manage Omni
3) All commissions including what you projected from Neal Insurance o deals in place of $65,000 would go to Omni
4) Jacobs will receive 10% of commissions on Revelation deal and 33% on any new business they bring.
5) Then as cash built up in Omni we would periodically distribute the earnings on a 50/50 basis

Given the recent turn of events it appears the best path forward would be to unwind Omni and I would like for you to surrender your 50% interest for the following consideration:
1) You keep all income from Neal Insurance
2) I will eat the expense of remodeling the main floor for $65,000 to accommodate the offices
3) You will receive the following:
- 50% of the commissions after the following expenses are deducted
- Any salary paid to you to date

---

[87]     JX 69.

24

> - Any expense incurred to ate for benefits or 401-K match
> - Half of the 10% commission we agreed to pay Jacobs
>
> 4)  This will be paid to you by Omni as the commissions flow into the company
>
> Lisa will provide a complete accounting and will make those payments wherever you direct.  If you are in agreement I will have Eddie prepare the documents to take you off of Omni, then Lisa can pay you any amounts that are available at that time.[88]

Neither party submitted an email response to this October 17 email into evidence.

The next email submitted from Neal was on October 22.  Henson asked, "Where did you and Jeff leave it [on Oct 17] with payroll for you? Not sure if I owe you or not and I will be working on payroll tomorrow."[89]  Neal responded:

> I can't say for certain, but I would like for you to pay me and put all in 401K as we discussed.  We need some money in account I know but hopefully a couple of my guys will pay on time and we can be in good shape by the end of the year.  KEMI commission won't kick in until December which will be for month of October and each month thereafter as I understand it.  You and I need to discuss Invoicing Neal Insurance accounts which I need to do right now.[90]

---

[88]  JX 65.  A little bit of knowledge is a dangerous thing.  Hoops and Neal both use terms with legally distinct definitions interchangeably.  I do not attribute legal significance to their layperson use of legal terms.  Instead, I attempt to capture the spirit of their agreement.

[89]  JX 70.

[90]  *Id.*

Henson replied in part, "Need to talk to Jeff about all the moving of account. . . . I thought [on Oct 17] he said he was leaving your current accounts with you. We really need to get this settled. Need to talk to Jeff about additional $ in account as those are his personal funds."[91]

On October 27, 2014, Neal emailed Hoops about Omni hiring a person to help with administrative work part time. At 11:11 a.m. Hoops responded, in part:

> I am really concerned about whether we are going to be able to make this work with Lisa and Heather as I spoke with both of them and it is not good.
>
> In the event we cannot get this worked out, I would propose we just unwind what we were going to do with Omni and you will get 50% of the commissions and keep everything you earn from Neal Insurance and just let our deal die when it comes up for renewal. Lisa is involved as CFO with all of my entities and she is an integral part of everything I am doing. It is clear you do not think much of Heather and I know little about insurance but she has done a great job for us the past 6 years and with all she and Joe are involved in for us, I cannot cut her loose.
>
> My gut is just work this out with you and give you the 50% and let you keep Neal and go back to the way it was for you before. I will eat the remodeling downstairs as I can probably use that space sometime in the future. If you are in agreement, I will get Eddie to draft up something that commits me to get you the 50% of commissions until October 5th, 2015 so you will have something in writing.[92]

---

[91]     *Id.*

[92]     JX 72.

Hoops and Neal exchanged two other emails and then at 12:14 p.m., Neal wrote: "Ok. 50% is fine. Paid through audit which might extend past 10-5-15. Might mean I have to return some money but that would be fair. . . . Tell me how I can get out of the way. Several questions need to be cleared up."[93] Hoops and Neal continued to discuss how they would go about winding up Omni via email on October 27 and 28.[94]

The relationship between Hoops and Neal continued to disintegrate. On October 30, 2014, Hoops sent Neal a letter on Omni letterhead purporting to terminate Neal's employment with Omni. The letter ends, "As your employment is ending today, you are neither eligible for nor entitled to any benefits with your previous employment with Omni. You will be paid all wages due you through today, October 30, 2014."[95] The evidence submitted at trial showed that Hoops and Neal continued to communicate sporadically via email up to and including May 2016.[96]

On October 30, 2014, Cunningham filed Articles of Incorporation for Black Diamond Insurance Group, LLC ("Black Diamond") in the Commonwealth of

---

[93]     *Id.*

[94]     *Id.*

[95]     JX 75.

[96]     *E.g.*, JX 110; JX 116; JX 135; JX 136; JX 167; JX 168; JX 170.

27

Kentucky.[97] Triple H is a fifty percent owner of Black Diamond, and Hammond and Jacobs are both twenty-five percent owners.[98] These members executed a written Operating Agreement for Black Diamond on November 10, 2018.[99]

### D. Procedural History

Plaintiff filed its Verified Complaint on May 4, 2016. Defendant answered on May 30, 2016. Plaintiff filed its Amended Verified Complaint on October 20, 2016. Defendant filed his Answer and Counterclaim on November 3, 2016. Plaintiff answered the Counterclaim on November 21, 2016. I granted Defendant leave to amend his Counterclaim on October 4, 2017, and Defendant filed his Amended Counterclaim on October 5, 2017. Plaintiff answered on October 16, 2017. Trial took place on November 6, 7, and 8, 2017. Post-Trial Argument occurred on April 19, 2018.

## II. ANALYSIS

"To succeed at trial, 'Plaintiffs, as well as Counterclaim–Plaintiffs, have the burden of proving each element . . . of each of their causes of action against each Defendant or Counterclaim–Defendant, as the case may be, by a preponderance of

---

[97]   JX 82.

[98]   JX 83.

[99]   JX 84.

28

the evidence.'"[100] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[101] The claims at issue in this case fall into three broad categories: (1) breach of contract; (2) breach of fiduciary duty; and (3) fraud. Triple H asserts breach of contract claims and breach of fiduciary duty claims against Neal and seeks judicial dissolution of Omni. Neal asserts breach of contract, breach of fiduciary duty, and fraud claims against Triple H and Hoops. For the reasons set forth below, I find that Neal breached some contractual and fiduciary duties; neither Triple H nor Hoops breached contractual or fiduciary duties or committed fraud; and judicial dissolution is unnecessary because Omni was dissolved by agreement of the members, but I order that Omni be wound up under 6 *Del. C.* § 18-803.

---

[100] *S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *15 (Del. Ch. Mar. 15, 2017) (quoting *inTEAM Assocs., LLC v. Heartland Payment Sys., Inc.*, 2016 WL 5660282, at *13 (Del. Ch. Sept. 30, 2016)), *aff'd*, 177 A.3d 610 (Del. 2017).

[101] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

## A. The Contract Between Hoops and Neal

The parties agree that Omni does not have a written operating agreement.[102] The parties instead entered into an oral agreement (the "Contract") subject to the default provisions of the Delaware Limited Liability Company Act (the "LLC Act").[103] The August 20 Email serves as contemporaneous evidence of the terms of the Contract. The parties have also stipulated to certain terms that do not appear in the August 20 Email.

Based on the stipulations and contemporaneous writings of the parties, the terms of the Contract are: (1) Triple H and Neal each own 50% of Omni and have equal voting rights;[104] (2) Neal would "roll all of Neal's Insurance's insurance, consulting and bond business into Omni"[105] starting on October 1;[106] (3) Neal "will be provided a Base Salary plus Benefits" starting October 1;[107] and (4) Jacobs Risk Management would assist in placing Revelation's insurance policies and receive ten

---

[102] PTO ¶ 16.

[103] *Whittington v. Dragon Gp. L.L.C.*, 2008 WL 4419075, at *2 (Del. Ch. June 6, 2008).

[104] PTO ¶¶ 2, 10.

[105] *Id.* ¶ 11.

[106] JX 17.

[107] *Id.*

percent of the commissions received for any "existing business" and thirty percent of the commissions for "new business."[108]

Neal and Hoops also each argue that other terms were included in the Contract. Neal seems to contend that in addition to the above terms, the parties also agreed that Omni would place Revelation's insurance policies in perpetuity.[109] Neal does not point to any evidence in the record, however, that supports his assertion that the parties agreed that Omni would place Revelation's insurance policies in perpetuity. Instead, Neal points to two email strings, one from September 1-2, 2014, where Neal and Hoops discuss concerns about placing Revelation's and Hoops's polices by the required 2014 dates,[110] and one from October 17, 2014, where Hoops summarizes his understanding of the deal, which does not discuss Revelation or Revelation's policies.[111] This evidence does not support the contention that Neal and Hoops agreed that Omni would place Revelation's policies in perpetuity. In fact, the evidence directly contradicts this. On September 2, Hoops wrote, "Thought

---

[108]   PTO ¶ 18.

[109]   Def.'s Opening Br. 34 ("Hoops/Triple H breached their contract by terminating Omni's business and diverting and directing from Omni, to a new insurance agency, Black Diamond, the present and future insurance business that Omni had or could have had.").

[110]   JX 23.

[111]   JX 66.

31

based on your conversation with Jim last week you were confident you could get everything done. Agree getting business covered is critical and if you see that cannot be done, then we can pull the plug on everything and go back to the way it is right now."[112] Neal responded, "Hopefully separation will be a long time in coming and better yet not ever. We can sale it if all goes well."[113] Thus, Neal has not shown by a preponderance of the evidence that the parties agreed that Omni would place Revelation's policies in perpetuity.

Hoops argues that in addition to the terms above, the parties agreed that "a material condition to forming Omni"[114] was that "Neal was to timely procure and service Revelation's and Hoops's 2014 renewal insurance policies."[115] The evidence does not support this contention. Hoops points to no evidence in the record that suggests the parties agreed that the placement of Hoops's and Revelation's policies was a condition to the formation of Omni. Instead, both parties knew all along that placing Revelation's and Hoops's polices by October 5 and October 15 respectively would be a challenge.[116] In fact, Hoops understood that his personal policies may

---

[112] JX 23.

[113] *Id.*

[114] Pl.'s Opening Br. 23.

[115] *Id.* at 41.

[116] Tr. 56 (Hoops).

32

have to be placed by another agent entirely.[117] Regarding the Revelation policies, at the beginning of September, Hoops wrote, "Agree getting business covered is critical and if you see that cannot be done, then we can pull the plug on everything and go back to the way it is right now."[118] While Hoops's email may evidence his subjective understanding of the importance of placing Revelation's policies, it does not show that Neal and Hoops agreed it would be a material condition at the time they entered into the Contract. At most, Hoops's email is an attempt to modify the original agreement to which Neal does not assent. Neal responded by cautioning Hoops that he might not be able to place all the policies, and "[w]orst case, you can renew with [Van Meter Insurance]."[119] Thus, Hoops has not shown by a preponderance of the evidence that a successful renewal of any of Revelation's or Hoops's personal insurance policies was a material condition to the formation of Omni.

---

[117] JX 25 ("had thought we could do personal policies as they are a month behind others, but if that is all we can do then we have no choice").

[118] JX 23.

[119] *Id.*

33

**B.      Dissolution of Omni by Agreement of the Members**

Omni's life was short.  The members of Omni agreed to dissolve under 6 *Del. C.* § 18-801(a) in October 2014.[120]  The Contract does not address dissolution; thus the LLC Act controls.  Under the version of 6 *Del. C.* § 18-801(a) in effect in October 2014, "[a] limited liability company is dissolved and its affairs shall be wound up . . . [u]nless otherwise provided in a limited liability company agreement, upon the affirmative vote or written consent of the members of the limited liability company."[121]  The members, with Hoops as Triple H's agent, agreed to dissolve Omni on October 15, 2014, and memorlized that agreement in writing on October 27, 2014.

Hoops testified that on October 15, he and Neal agreed "Omni would be dissolved and that we would go our separate ways and that we would split the commissions for the next year 50-50."[122]  On October 16 at 1:19 p.m. Neal wrote an email that is consistent with this testimony, and with Neal's pattern of behavior, "Regardless of how or whether we change our Omni concept.  We are in agreement

---

[120]     The parties have requested judicial dissolution under 6 *Del. C.* § 18-802, but because the members of Omni agreed to dissolve under 6 *Del. C.* § 18-801(a), judicial dissolution under Section 18-802 is unnecessary.  *Spellman v. Katz*, 2009 WL 418302, at *3 n.26 (Del. Ch. Feb. 6, 2009).

[121]     6 *Del. C.* § 18-801(a)(3) (1999).

[122]     Tr. 78 (Hoops); Tr. 299 (Neal).

on a 50/50 split for this year. Correct?"[123] Hoops replied, "Lisa has been waiting to give you a check for nearly 2 weeks. Believe I want to go direction I laid out yesterday."[124] Each testified that they met on October 17 and acted in accordance with their agreement to dissolve Omni by splitting equally the majority of the commissions Omni had received at that point.[125] At 9:15 a.m. the same day, Hoops emailed Neal and Henson, consistent with their pattern of behavior, a summary of what Neal and Hoops agreed to:

> As you know on September 1, 2014 we agreed to the following structure for Omni:
> 1) Omni owned 50/50 by you and Triple H family LP
> 2) You would be paid a salary of $100K per year plus benefits to manage Omni
> 3) All commissions including what you projected from Neal Insurance deals in place of $65,000 would go to Omni
> 4) Jacobs will receive 10% of commissions on Revelation deal and 33% on any new business they bring.
> 5) Then as cash built up in Omni we would periodically distribute the earnings on a 50/50 basis
>
> Given the recent turn of events it appears the best path forward would be to unwind Omni and I would like for you to surrender your 50% interest for the following consideration:
> 1) You keep all income from Neal Insurance

---

[123]    JX 61.

[124]    *Id.*

[125]    Tr. 81-82 (Hoops); Tr. 299 (Neal).

2) I will eat the expense of remodeling the main floor for $65,000 to accommodate the offices

3) You will receive the following:
- 50% of the commissions after the following expenses are deducted
- Any salary paid to you to date
- Any expense incurred to ate for benefits or 401-K match
- Half of the 10% commission we agreed to pay Jacobs

4) This will be paid to you by Omni as the commissions flow into the company

Lisa will provide a complete accounting and will make those payments wherever you direct. If you are in agreement I will have Eddie prepare the documents to take you off of Omni, then Lisa can pay you any amounts that are available at that time.[126]

Neither party submitted an email response to this October 17 email into evidence, but Hoops and Neal exchanged emails on October 27, 2014, which constitute written consent of the members to dissolve Omni.

On October 27, Neal emailed Hoops about Omni hiring a person to help with part-time administrative work.[127] At 11:11 a.m. Hoops responded by laying out the terms of the October 15 agreement a third time. Hoops wrote, "In the event we cannot get this worked out, I would propose we just unwind what we were going to do with Omni and you will get 50% of the commissions and keep everything you

---

[126] JX 65.

[127] JX 73.

earn from Neal Insurance and just let our deal die when it comes up for renewal."[128]

At 11:59 a.m. Neal responded, in part, "I will agree with what needs to be done but it is a real shame."[129]  Hoops wrote back at 12:04 p.m., in part, "Hopefully it worked out ok for you and you got a nice payday out of it and I guess I got the bottom floor remodeled, so it was a win for everyone."[130]  Neal responded at 12:14 p.m., "OK. 50% is fine. Paid through audit which might extend past 10-5-15.  Might mean I have to return some money but that would be fair. . . . Tell me how I can get out of the way.  Several questions need to be cleared up."[131]  This email exchange constitutes the written consent of the members to dissolve Omni.

After the parties consented to dissolve Omni, they could not agree on the next steps that needed to be taken during the winding up process.  Neal's concerns mostly centered on how Revelation's 2014-2015 policies would be serviced because he felt he had a legal obligation to continue servicing them.[132]  Neal also wanted to know what Hoops was planning to do for his insurance after October 5, 2015.[133]  Hoops

---

[128]    *Id.*

[129]    *Id.*

[130]    *Id.*

[131]    *Id.*

[132]    *Id.*; Tr. 302 (Neal).

[133]    JX 73.

said he thought he would go back to Van Meter Insurance because "they stepped up and done my personal at the last minute."[134] Hoops and Neal never succeeded in winding up Omni.

Under 6 *Del. C.* § 18-803, "the Court of Chancery, upon cause shown, may wind up the limited liability company's affairs upon application of any member or

---

[134] *Id.* Neal argues that Hoops made "false representations" in order to induce Neal to agree to dissolve Omni by saying he (Hoops) was going "get out of the insurance business" and go back to Van Meter Insurance. Def.'s Opening Br. 50-51. This argument is not supported by the evidence. No one points to any evidence that Hoops's plans after Omni were discussed at either the October 15 or 17 meetings. In his October 27, 2014 email at 11:11 a.m., Hoops wrote, "My gut is to just worth this out with you and give you the 50% and let you keep Neal and go back to the way it was for you before." JX 73. After he agrees to dissolve Omni at 12:14 p.m., Neal sends Hoops another email, seemingly in response to Hoops's 11:11 a.m. email, asking, "When you say you are going back to how you were, what does that mean right now? Back to [Van Meter]? Someone else?" *Id.* Hoops then responds, "I am going to do what I said, which is keep Revelation with Omni until October 5th, then most likely will go back to [Van Meter] as they stepped up and done my personal at the last minute . . . . If you want to turn it over to lawyers and let them deal with it, I am happy to do that as well and in the meantime I will move everything back to [Van Meter] and you can keep the $75,000." *Id.* Neither these emails, nor any other evidence pointed to by Defendant, show that Hoops represented that he was "getting out of the insurance business" prior to Neal agreeing to dissolve Omni. Defendant also points to *Dweck v. Nasser*, 2012 WL 161590 (Del. Ch. Jan. 18, 2012), to argue that Neal did not "consent" to dissolve Omni. This reliance is misplaced. In *Dweck*, Dweck argued that Nasser had given Dweck permission to compete with the company at issue in that case. *Id.* at *14. Dweck then used the company's resources to directly compete with the company. *Id.* This Court made a credibility determination and held that Dweck had never asked for permission. *Id.* at *15. Thus, Nasser had never consented to the competition, so Dweck could not rely on the consent as a defense to the competition. *Id. Dweck* is far from on point. Here, the parties agreed to dissolve Omni. Hoops did not need Neal's permission or consent to compete because, as discussed, Omni was dissolved when the alleged competition took place.

manager, . . . and in connection therewith, may appoint a liquidating trustee."[135]

Despite Neal and Hoops's agreement in October 2014 to dissolve Omni, they have been unable to successfully wind up the affairs of Omni. This is in large part due to Neal attempting to renegotiate the terms of the dissolution and winding up, including during the course of this litigation.[136] I find that due to this pattern of behavior, good cause has been shown, and I order that Omni be wound up under Section 18-803. Triple H has requested that it be appointed liquidating trustee.[137] Neal did not respond to this request. Therefore, I appoint Triple H liquidating trustee. Triple H will wind up Omni's affairs in accordance with 6 *Del. C.* § 18-804 and Hoops and Neal's agreement.

## C. Breach of Fiduciary Duty Claims Against Hoops and Triple H

### 1. Hoops owed fiduciary duties as a de facto manager of Omni

Under the LLC Act, a manager of an LLC is defined as "a person who is named as a manager of a limited liability company in, or designated as a manager of

---

[135] 6 *Del. C.* § 18-803(a) (2015).

[136] *See, e.g.*, JX 116 ("We will have to play the Omni dissolution date by ear. I would say by 12-1-15 we should have everything wrapped up."); JX 167 ("I agree we need to close out Omni. I have problem in being part of the $10000+ payment to Jacobs which was n 2014 possibly."); JX 168 ("I am asking you for $1,000,000 to settle versus going forward with $7-10,000,000 in damages . . . I made about $150,000 and you will make that plus all the additional you stole from me."); JX 170 ("I would need something from Meluney dropping the Complaint").

[137] Pl.'s Opening Br. 51.

39

a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited liability company is formed."[138] But, Delaware case law has recognized that a person who is not named or designated a manager in the LLC's governing documents may nonetheless be deemed a de facto manager and fiduciary of the LLC.[139] In *WaveDivision*, then-Vice Chancellor, now-Chief Justice Strine recognized that a person who "had unfettered access to [the LLC's] confidential information, helped plan [the LLC's] responses to various outside parties on important issues, and co-presented with [the LLC's CEO] during [the LLC's] updates to its lenders" was a de facto manager, and fiduciary, of the LLC.[140] The de facto manager in *WaveDivision* was not an official officer or part of the management committee, which on paper was separately managed.[141] Nonetheless, this Court held that his access and actions made him a de facto manager, and in that context he owed fiduciary duties and could bind the company as an agent.[142]

---

[138]    6 *Del. C.* § 18-101(10).

[139]    *WaveDivision Hldgs., LLC v. Millennium Digital Media Sys., L.L.C.*, 2010 WL 3706624, at *3 (Del. Ch. Sept. 17, 2010).

[140]    *WaveDivision Hldgs.*, 2010 WL 3706624, at *3.

[141]    *Id.*

[142]    *Id.*

Here, Hoops's actions, taken in their totality, exhibit the same degree of control over Omni as the de facto manager in *WaveDivision* and mandate the same result.[143] Hoops signed Omni's Certificate of Formation as organizer;[144] retained and directed his personally attorney to set up Omni, including drafting Omni's operating agreement;[145] directed the CFO of his other business to handle the back office work for Omni, including setting up a website, ledger, and back accounts;[146] loaned the initial working capital to Omni;[147] staffed Omni with Jacobs and Hammond;[148] managed the relationship between Neal and Hammond;[149] approved Neal's hiring decisions and payment of Omni employees;[150] and sent a letter to Neal purporting to terminate him as an employee of Omni.[151] Hoops was sufficiently

---

[143]   Plaintiff does not grapple with the distinction between Hoops and Triple H here. Plaintiff only argues that Hoops's actions were not sufficient to make him a de facto manager of Omni. Thus, I do not consider the distinction in my analysis.

[144]   JX 21.

[145]   JX 17. Neal never signed this agreement. Tr. 48-49 (Hoops); Tr. 248 (Neal).

[146]   JX 17.

[147]   *Id.*

[148]   JX 10; Tr. 490 (Hammond).

[149]   JX 27.

[150]   JX 72.

[151]   JX 75.

41

involved in, and had sufficient control over, the management of Omni to consider him a de facto manager, which makes him a fiduciary.[152]

Plaintiff argues that Hoops is not a de facto manager because the Contract designates Neal as "President and CEO."[153]  First, an LLC can have more than one manager;[154] the fact that Neal was a manager of Omni does not preclude Hoops from also being a manager, de facto or otherwise.  Second, under *WaveDivision*, a person other than a named officer can act as a de facto manager.[155]  Third, Plaintiff relies on *Ensing v. Ensing*[156] to support their argument that a person cannot serve as a de facto manager if there are written agreements to the contrary.[157]  *Ensing* is not on point.  In *Ensing*, this Court found that a clear, unambiguous, fully integrated operating agreement precluded the court from taking notice of the fact that the member not designated as a manager was "the financial impetus behind the acquisition and operation of the vineyard," that he has always acted as the "de facto

---

[152]  *Id.*

[153]  Pl.'s Answering Br. 30.

[154]  *Child Care of Irvine v. Facchina*, 1998 WL 409363, at *4 (Del. Ch. July 15, 1998).

[155]  *WaveDivision Hldgs.*, 2010 WL 3706624, at *3.

[156]  2017 WL 880884, at *8 (Del. Ch. Mar. 6, 2017).

[157]  Pl.'s Answering Br. 32.

manager," or from considering any extrinsic evidence.[158] I am not similarly limited

here, as there is no fully integrated operating agreement.[159] Moreover, all the parties

repeatedly rely on extrinsic evidence to support their arguments when it suites them.

For example, Plaintiff points to no less than three different emails as evidence that

Neal was a manager of Omni. Plaintiff offers no explanation for why I can look to

various different pieces of evidence to determine that Neal was a manager but am

prevented from looking at the evidence to determine if Hoops acted as a manager.

When I consider all the evidence of Hoops's involvement in the management and

decision-making process of Omni, I find that he acted as a de facto manager and

fiduciary of Omni. As discussed above, fiduciaries of a LLC owe fiduciary duties

to the LLC, and I find that Hoops did here as well.

### 2. Hoops and Triple H did not usurp Omni's corporate opportunities

Neal asserts breach of fiduciary duty claims against Hoops and Triple H,

alleging they used Black Diamond to usurp Omni's corporate opportunity to place

Revelation's insurance policies. The corporate opportunity doctrine in Delaware

---

[158] *Id.*

[159] Plaintiff argues "even though Omni does not have a formal operating agreement, its affairs are governed by the parties' writings." *Id.* at 31.

43

was elucidated in *Guth v. Loft* and its progeny.[160]  The doctrine, on the one hand,

bars an officer or director from taking a business opportunity for his own if:

> (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.[161]

On the other hand, a director or officer may take a corporate opportunity if:

> (1) the opportunity is presented to the director or officer in his individual and not his corporate capacity; (2) the opportunity is not essential to the corporation; (3) the corporation holds no interest or expectancy in the opportunity; and (4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity.[162]

Neither Hoops nor Triple H usurped a corporate opportunity from Omni

because Omni was dissolved before the opportunities allegedly usurped arose.

Neither party addresses how the corporate opportunity doctrine is effected by the

dissolution of the entity.  Under Delaware corporate and limited liability law,

however, dissolution of an entity causes any new business to cease.[163]  The parties

---

[160]    5 A.2d 503 (Del. 1939).

[161]    *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154–55 (Del. 1996).

[162]    *Id.* (citing *Guth*, 5 A.2d at 509).

[163]    Under Delaware corporate law there is a statutory three-year winding up period. *Addy v. Short*, 89 A.2d 136, 139 (Del. 1952) ("During the three-year period of

first agreed to the terms of dissolution on October 15, and Omni was dissolved in writing on October 27, 2014. At the earliest, Black Diamond was formed on October 30, 2014.[164] If Omni was dissolved and winding up, and thus not doing any new business, before Black Diamond was even formed, then it would be impossible for Black Diamond to usurp an opportunity that Omni was "financially able to exploit" or in which Omni had an interest or expectancy.[165] It is unnecessary to continue the analysis any further. Neither Hoops nor Triple H usurped any corporate opportunities, and thus, neither Hoops nor Triple H violated any fiduciary duties.

---

winding up, the corporation functions exactly as it had functioned before dissolution, with the important qualification that its powers are limited to closing its affairs and do not extend to carrying on the business for which it was established"). The LLC Act does not have a similar mandatory winding up period, but generally states that once a LLC has been dissolved it is winding up until the certificate of termination has been filed. 6 *Del. C.* § 18-801; 6 *Del. C.* § 18-803(b).

[164] Defendant is concerned about how quickly Hoops began making plans to replace him in Omni and arranged Black Diamond. Hoops does not discuss replacing Neal until after they had agreed to dissolve Omni. JX 69. Black Diamond is not formed until after Hoops and Neal confirm their October 15 agreement in writing on October 27. Moreover, the timeline on which Black Diamond was established is in line with the timeline on which Omni was formed. *Compare* JX 5 (Omni is first discussed on August 17) and JX 17 (Omni solidifies LLC agreement in writing on August 20) *with* JX 69 (Black Diamond is first discussed in some form on October 17) and JX 84 (Black Diamond solidifies LLC agreement on November 10)

[165] *See Broz*, 673 A.2d at 156-57 ("CIS was actively engaged in the process of divesting its cellular license holdings . . . . Thus, CIS had no interest or expectancy in the Michigan–2 opportunity.").

**D.    Fraud Claims Against Hoops and Triple H**

To prove his fraud claim, Defendant must prove, by a preponderance of the evidence, that Hoops (1) "made a false representation";[166] (2) "knew the representation was untrue or made the statement with reckless indifference to the truth";[167] (3) "intended for [Defendant] to rely on the representation; (4) [Defendant] justifiably relied on the representation; and (5) damage occurred to [Defendant] as a result of that reliance."[168]  Defendant has failed to prove by a preponderance of the evidence that Hoops made a false representation.

Defendant avers that Hoops concocted a scheme to use Neal as an intermediary to move his insurance away from Van Meter and then replace Neal with Jacobs and Hammond.[169]  Defendant's support for this proposition is that the contract between Jacobs Risk Management and Van Meter Insurance Group contains a non-solicitation provision.[170]  The non-solicitation provision, in relevant part, ensures that "[d]uring the terms of this contract and for a period of 24 months after

---

[166]    *Paron Capital Mgmt., LLC v. Crombie*, 2012 WL 2045857, at *5 (Del. Ch. May 22, 2012), *aff'd*, 62 A.3d 1223 (Del. 2013).

[167]    *Id.*

[168]    *Id.*

[169]    Def.'s Opening Br. 44.

[170]    *Id.*

46

termination of this contract, [Jacobs Risk Management] will not directly or indirectly solicit VAN METER INSURNCE GROUP clients or prospects."[171]  Defendant's theory fails for three reasons.

First, Defendant presented no evidence that Hoops was a client of Van Meter rather than Jacobs Risk Management.  In fact, the evidence introduced at trial supports a finding that Hoops was a client of Jacobs Risk Management rather than Van Meter,[172] and thus, the non-solicitation provision does not apply to Hoops. Second, even if Hoops was a client of Van Meter, the non-solicitation clause does not bind Hoops.  As the client, Hoops is free to hire whomever he pleases, whenever he pleases.  Therefore, Neal's theory that Hoops was forced to use an intermediary to circumvent a contract that does not bind him makes no sense.

Third, Plaintiff presented ample evidence at trial that the end of Omni was a result of underwhelming job performance on the part of Neal rather than a nefarious plot on the part of Hoops.  At trial, Hoops showed that Neal failed to secure, in a timely manner, D&O coverage for Revelation and insurance for Hoops's personal

---

[171]    JX 4, at 2.

[172]    Tr. 20 (Hoops) ("[B]asically all of our contact was with Jacobs, but they used another agency. Van Meter Insurance Group out of Lexington, Kentucky, was the actual underwriter -- or I guess broker or actually wrote the policies."); Tr. 485 (Hammond) (testifying that Jacobs Risk Management had serviced Revelation's insurance policies since its inception).

assets, possibly exposing Hoops to millions of dollars of risk.[173] These failures happened on October 5 and October 15, respectively. Both exposures were ultimately remedied, and neither Revelation nor Hoops suffered any actual harm. But Hoops made it clear to Neal that he was extremely unhappy with Neal's performance.[174] In light of these potentially catastrophic failures to secure insurance for Omni's only real customers, it is more probable than not that Hoops decided to terminate his relationship with Neal due to Neal's performance as an insurance agent as opposed to concocting a months-long scheme that Hoops personally financed to the tunes of tens of thousands of dollars to get around a non-solicitation provision that does not actually seem to prevent him from accomplishing his supposed aim. For these reasons, Defendant has failed to carry his burden at trial and his fraud claim fails.

### E. Breach of Contract and Breach of Fiduciary Duty Claims Against Neal

Neal breached both his contractual and fiduciary duties. He breached his contractual duties by failing to roll Neal Insurance's business into Omni. He breached his fiduciary duties by misrepresenting to Hoops that Revelation had

---

[173] Tr. 70-71 (Hoops); JX 47; JX 54.

[174] JX 54.

insurance when it did not and exposing Omni to serious potential liability and reputational harm with the lapse.

### 1.    Neal breached the Contract

"To prove a breach of contract claim, a plaintiff must show: "the existence of a contract, the breach of an obligation imposed by that contract, and resulting damages to the plaintiff."[175]  Post-trial, "a claimant asserting a breach of contract must prove the elements of its claim by a preponderance of the evidence."[176]  As discussed above, and as the parties concede, Neal and Hoops entered into a contract. As part of the Contract, Neal agreed to "roll all of Neal's Insurance's insurance, consulting and bond business into Omni"[177] starting on October 1.[178]  The parties stipulated that "Neal did not roll any of Neal Insurance's business into Omni."[179] Therefore, Neal breached the Contract.  The only remaining element is damages.

---

[175]    *In re Mobilactive Media, LLC*, 2013 WL 297950, at *14 (Del. Ch. Jan. 25, 2013) (quoting *Weichert Co. of Pa. v. Young*, 2007 WL 4372823, at *2 (Del. Ch. Dec. 7, 2007)).

[176]    *Estate of Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009) (citing *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834 n. 112 (Del. Ch. 2007)).

[177]    PTO ¶ 11.

[178]    JX 17.

[179]    PTO ¶ 32.

Plaintiff sufficiently proved his damages. Plaintiff's expert, Stephen Scherf, "quantified the revenues earned by Neal Insurance over the damages period" by using the checks deposited into Neal Insurance's checking accounts.[180] He then "quantif[ed] and substract[ed] the costs incurred by Neal Insurance . . . that are appropriate" and divided by two "to calculate the amount due to Triple H."[181] Neal does not contest Scherf's methodology or the amount of damages he calculated.[182] While this methodology is acceptable, the expert calculated the damages from August 25, 2014 to October 17, 2014.[183] The actual damages period is October 1, 2014 (the date Hoops and Neal agreed Neal would roll over Neal Insurance) to October 27, 2014 (the date when Omni was dissolved by written agreement of the members). Thus, Plaintiff's damages are "the benefit that Neal withheld from Omni" measured using Scherf's methodology from October 1, 2014 to October 27, 2014 only.

Plaintiff is not entitled to recover these damages, however, because the parties resolved this particular dispute when they dissolved Omni. Plaintiff represented in multiple contemporaneous written documents and throughout this litigation that

---

[180]    JX 183, at 6.

[181]    *Id.*

[182]    JX 185.

[183]    JX 183.

Neal and Hoops agreed that Neal would keep all of his income from Neal Insurance when Omni was dissolved.[184] Plaintiff relies on this agreement to dissolve as support for its defense against Neal's breach of fiduciary duty claim against Plaintiff. I find Plaintiff's testimony and the contemporaneous documents credible on this point, and I find they agreed that Neal would keep all of Neal Insurance's income. In other parts of this memorandum opinion, this agreement to dissolve has favorable legal consequences for Plaintiff. Plaintiff offers no explanation for why it should not now be held to the agreement that it admittedly made with Neal, and I see no reason to allow Plaintiff to cherry pick from the agreement it relies upon.

## 2. Neal breached his fiduciary duties to Omni

Managers of a Delaware LLC owe default fiduciary duties.[185] "[T]he traditional duties of loyalty and care . . . are owed by managers of Delaware

---

[184] *See, e.g.*, JX 65; JX 72; Pl.'s Opening Br. 31-32.

[185] *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 851 (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012). Hoops alleges both breach of contract and usurpation of corporate opportunity related to the same behavior by Neal: failing to roll Neal Insurance into Omni. Hoops also seeks the same remedy for the alleged breach of contract and breach of fiduciary duty: disgorgement of half the profits made by Neal Insurance before Omni was dissolved. I address only the breach of contract claim because the usurpation of corporate opportunities claim is duplicative. *Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *14 (Del. Ch. Aug. 30, 2013). I also do not address additional breach of fiduciary duty claims raised by Hoops only in the context of an unclean hands defense. These include allegations that Neal breached his fiduciary duties by opening an additional bank account for Omni and redirecting KEMI commissions to that account without Neal's knowledge; falsifying the application for that bank account; failing to secure insurance coverage for certain assets Revelation purchased in January 2015; and "misleading the Court

51

LLCs . . . in the absence of a contractual provision waiving or modifying those duties."[186]  "The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[187] The duty of care requires that managers avoid "conduct that constitutes reckless indifference or actions that are without the bounds of reason."[188]  I find that Neal breached these duties by misleading his only customer about a serious lapse in the customer's insurance coverage.  Neal did not breach these duties in relation to the October 17 distribution.

### a.    The October 2014 lapse

Revelation was Omni's biggest customer.[189]  On October 1, 2014, Neal emailed Hoops, Revelation's CEO, to report that Omni had successfully renewed all

---

to secure an unfair tactical advantage."  Pl.'s Answering Br. 19-22.  Because I do not find for Neal on any of his breach of contract or breach of fiduciary duty claims against Plaintiff, I do not address Plaintiff's unclean hands defense.

186    *Id.* at 843.  Delaware courts "look to the corporation law when assessing the extent to which a managing member owes common law fiduciary duties when those duties are not clearly defined in the entity's operating agreement."  *A&J Capital, Inc. v. Law Office of Krug*, 2018 WL 3471562, at *5 (Del. Ch. July 18, 2018).

187    *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (citing *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984)).

188    *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008).

189    Tr. 70 (Hoops).

eleven of Revelation's insurance policies, ahead of the October 5 deadline.[190]  On October 4, however, Neal emailed Hoops and Henson, "I was not able to get the policy number on the D&O from the wholesaler representing Westchester.  The wholesaler said there was a concern with the questions on Friday."[191]  Hoops replied, "Are we going to be without insurance for some period of time now?  Having coverage is more important than anything else as I would not Want to e itch out insurance for one minute as we have people on our jobs 24/7."[192]  Neal assured Hoops that everything was fine, writing, "Most likely someone of authority with Westchester was out Friday afternoon and upon return Monday morning will approve and coverage will be in effect midnight Sunday morning – 10-05-14 as if nothing happened."[193]  Hoops replied, "I would have submitted financing without D&O as I would never take the chance of not having liability and equipment coverage.  Will anything be covered as of midnight tomorrow night?  If not I would

---

[190]     JX 41.

[191]     JX 47.

[192]     *Id.*

[193]     *Id.*

shut the operations down until something is in place. That cost us about $1.1mm per day."[194] Revelation's D&O policy lapsed at midnight on October 5, 2014.[195]

October 4 was a Saturday.[196] Neal did not respond to Hoops's last email until a little after 8 a.m. on Monday, October 6.[197] He told Hoops and Henson, "All coverages are bound, went into effect at midnight Sunday morning. I have the policy numbers for them except the D&O. The D&O might be bound as well and they tell us this morning that they just did not have time to get us the policy number."[198] Meanwhile, Neal emailed the insurance intermediary asking what is happening with the D&O insurance.[199] Neal also emailed other insurance providers trying to find another D&O policy for Revelation.[200] He was still sending these emails on October 8, three days after the D&O policy lapsed.[201] The evidence suggests that from October 5 until at least October 8, Revelation did not have D&O insurance. The

---

[194]    *Id.*

[195]    JX 48.

[196]    Tr. 69 (Hoops).

[197]    JX 47.

[198]    *Id.*

[199]    JX 310.

[200]    JX 48.

[201]    JX 60.

parties do not point to any evidence that Neal informed Hoops that he was trying to procure replacement insurance.

Revelation is a coal mining business.[202] If some disaster had occurred during the time when the D&O insurance was not in place, it is very unlikely that Revelation would have been able to find an insurance provider that would cover the claim.[203] What is more, Neal did not respond to Hoops after 7:42 p.m. on October 4 and then continued to keep him in the dark about the actual status of the D&O insurance. In fact, he affirmative assured Hoops on Monday that "all coverages [were] bound and went into effect at midnight Sunday morning."[204] Neal knew this was not quite true and continued to search for D&O coverage for days.[205] The failure to secure coverage, and the failure to truthfully and fully inform his client of that failure, exposed Omni to a significant risk of monetary and reputational harm. At the very least, this behavior was not in the best interest of Omni and constitutes a breach of Neal's fiduciary duties.

---

[202]    PTO ¶ 14.

[203]    *See* JX 54 (where Neal explains that there could be a problem with getting a claim covered in the period between when the prior coverage lapses and the new coverage is bound).

[204]    JX 47.

[205]    JX 48; JX 60; JX 310.

Thankfully no tragedy occurred during the time Revelation was uninsured, and Neal eventually procured a D&O policy effective October 5, averting disaster. Plaintiff does not request any damages for Neal's breach of fiduciary duty. It appears that Hoops is content not to seek a remedy for this breach but instead to just be done with Neal and Omni. Therefore, I award nominal damages for Neal's breach of his fiduciary duty.

### b.  The distribution

Plaintiff argues that Neal breached his fiduciary duties to Omni by "strong-arming" Hoops into making a distribution. On October 17, 2014, Henson and Neal met to sign the financing agreement that would govern the financing for the premiums that Revelation needed to pay.[206] Hoops testified that Henson called him down to her office to address an issue.[207] He further testified that he went down to her office, and she told him that Neal was refusing to sign the finance agreement "which is obviously required in order to get the additional premiums that are necessary to be paid to the underwriter. So without that, we would not have insurance coverage"[208] unless Henson wrote "him a check for the full commissions

---

[206]    *See* JX 64.

[207]    Tr. 81 (Hoops).

[208]    *Id.*

at the time, which were $200,000."[209] Hoops testified that he told Neal "'Jerry, our deal was 50-50. You don't get all the commissions. It's 50-50.' So eventually we agreed that we would distribute $150,000. And so 75,000 was given to Jerry and 75,000 was given to Triple H Family Limited Partnership, leaving about $50,000 in Omni at that time."[210]

Neal also testified about the events of October 17. He testified that he "just needed some money" but did not know that a distribution was required.[211] He further testified, "But in reality, the business sense of it was that we probably did both have to take a distribution, as [Hoops] said. And then [Hoops] said 75 K. I said, Okay, fine. It didn't last a minute, and that was the end of that."[212] Neal further explained that he had discussed this possible payment with Hoops twice over the prior two days: "And, you know, we talked about it on the 16th, the evening. We talked about it on the 15th. I told him when I came in there I wanted half the commissions, which were mine. This was normal policy for agents to do that in agencies. If it would be in the agency, I wanted my half."[213] Neal continued:

---

[209]    *Id.*

[210]    Tr. 82 (Hoops).

[211]    Tr. 299 (Neal).

[212]    *Id.*

[213]    Tr. 418 (Neal).

And [Hoops] comes down, at some point, and he said we, you know, he -- we were talking about getting the other monies for the accounts, as well, I mean, getting money in there. And there's an issue, something wrong with the checks. We had to go to the bank and do some of this.

So it was not going to be a quick, easy process, but we had to figure out how much to pay the carriers. And I had a little net premium summary that we had looked at, and I scribbled on the right-hand side what the commissions were. It came up to whatever it was, 205-, 212,000, something in that neighborhood.

He said, we should leave something in there. We can't take it all out. I have to take whatever you have to take. I said, Oh, okay, 75,000. Let's take 75. Okay. That's the end of it. It lasted about a minute. You know, and he's gone.[214]

After this testimony, Plaintiff's counsel confronted Neal with an undated, typed document that Neal authenticated as a "synopsis of some points that I was putting together for an attorney."[215] The document includes the following paragraph:

I arranged a Premium Finance agreement for about half of the Revelation Premiums which generated about $200,000 of commission immediately. I demanded to get paid before I signed the Finance Agreement and Jeff and I took $75,000 each much to his objection. No reason not to take the money. We left $50,000 in the account for expenses etc.[216]

In response to being shown this document, Neal testified:

---

[214]    Tr. 418-19 (Neal).

[215]    Tr. 420 (Neal).

[216]    JX 190.

58

But my testimony is that I didn't demand that money. We didn't get to that point. I didn't have to demand it. He pretty much -- there wasn't any reason to leave the money in there. As manager of what I -- I mean, I didn't see any reason. He didn't -- I made that point to him.

If we left 50,000 in there, as we did, we arrived at that very quickly in a discussion. That was enough money. And then we were going to get the KEMI monies in there. And then if we decided to keep going, then the other insurance monies was going to be there.

So there was no reason for me to not -- that I could see for leaving that money in there, especially with what had been taking place a couple days earlier. He was already talking about unwinding it. And I hadn't won any of these deal with any of them.[217]

Counsel for Plaintiff then asked, "Mr. Neal, you knew that this demand would work because two weeks before this, he told you he would rather shut down his operations and lose $1.1 million a day than let him go uninsured. So you knew that this strong-arm tactic would work. Isn't that right?"[218] Neal responded:

The policies had been in effect and bound two weeks earlier, and he's been in 10 businesses at this time and 23 now. He knows what a binder is. We had sent certificates of insurance to the states, the Division of Mined Land Reclamation in Virginia, and we sent them to the DNR in West Virginia with policy numbers on them, evidencing coverage. And we had, with HIIG, which wrote I think five of eleven policies, we had something like 60 days from the get-go on it, to pay them. While they generally

---

[217]    Tr. 421 (Neal).

[218]    Tr. 422 (Counsel for Plaintiff).

59

want the finance contract done in 30 days, they would like it done earlier.[219]

While I find Hoops's testimony that Neal forcefully requested a distribution on October 17 credible, I also find Neal's testimony that insurance coverage was in place and would not lapse if the finance agreement was not signed on October 17 credible. Furthermore, the distribution is consistent with the Hoops and Neal's October 15 agreement to dissolve Omni and split the commissions equally, rather than some strong-arm tactic.[220] Finally, the distribution did not violate 6 *Del. C.* § 18-607. Thus, I do not find that Neal breached his fiduciary duties or that the ultimate distribution was contrary to the best interests of Omni at the time it was made.

### F. Attorneys' Fees

Both Plaintiff and Defendant have requested attorneys' fees and costs incurred in connection with this litigation. Under the "American Rule," "each party is normally obliged to pay only his or her own attorneys' fees, whatever the outcome of the litigation."[221] Under my equitable powers, I may shift attorneys' fees and costs in certain limited circumstances, including (1) if there is express statutory

---

[219] Tr. 422 (Neal).

[220] JX 61; Tr. 78 (Hoops); Tr. 323 (Neal).

[221] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998).

60

authorization or a contractual fee shifting provision; (2) "the presence of a 'common fund created for the benefit of others;'" (3) "where the judge concludes a litigant brought a case in bad faith or through his bad faith conduct increased the litigation's cost; and" (4) "cases in which, although a defendant did not misuse the 'litigation process in any way, ... the action giving rise to the suit involved bad faith, fraud, "conduct that was totally unjustified, or the like" and attorney's fees are considered an appropriate part of damages.'"[222]  I may also "award fees in the limited 'circumstances of an individual case [that] mandate that the court, in its discretion, assess counsel fees 'where equity requires.'"[223]  "To justify an award under the bad faith exception, 'the Court must conclude that the party against whom the fee award is sought has acted in subjective bad faith.'"[224]  None of these circumstances are present here.  Therefore, all requests for attorneys' fees are DENIED.

## III.  CONCLUSION

I award Plaintiff nominal damages for Neal's breach of fiduciary duty.  I also order that Omni be wound up pursuant to 6 *Del. C.* § 18-803 and that its assets be

---

[222]  *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686-87 (Del. 2013).

[223]  *Id.* (quoting *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 421 (Del.1994)).

[224]  *K&G Concord, LLC v. Charcap*, 2018 WL 3199214, at *1 (Del. Ch. June 28, 2018) (quoting *In re Del Monte Foods Co. S'holders Litig.*, 2011 WL 2535256, at *6 (Del. Ch. June 27, 2011)).

distributed in accordance with 6 *Del. C.* § 18-804 and Hoops and Neal's agreement. I appoint Triple H liquidating trustee to wind up Omni's affairs. All other requested relief is denied. The parties shall submit an implementing form of order within five days of the issuance of this memorandum opinion.

**IT IS SO ORDERED**.